**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-4458**

---

UNITED STATES OF AMERICA,

         Plaintiff - Appellee,

   v.

MAURICE OWEN WILEY, JR., a/k/a Tweet,

         Defendant - Appellant.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, District Judge.  (1:19−cr−00529−TDS−1)

---

Argued:  September 19, 2023              Decided:  February 15, 2024

---

Before DIAZ, Chief Judge, and WILKINSON and BENJAMIN, Circuit Judges.

---

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Benjamin joined.

---

**ARGUED:**  Mark Patrick Foster, Jr., FOSTER LAW OFFICES, PLLC, Charlotte, North Carolina; John David Bryson, WYATT, EARLY, HARRIS & WHEELER, LLP, High Point, North Carolina, for Appellant.  Graham Tod Green, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Sandra J. Hairston, United States Attorney, Greensboro, North Carolina, Craig M. Principe, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Winston-Salem, North Carolina, for Appellee.

DIAZ, Chief Judge:

A jury convicted Maurice Owen Wiley, Jr., of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), attempted Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2, and conspiracy to possess firearms in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(o). Wiley appeals, raising a host of challenges. As we explain, we affirm.

## I.

## A.

Wiley and his coconspirators agreed to rob Wai Ping Chan and Hong Zheng, the married owners of the China Wok restaurant in Durham, North Carolina. Wiley's coconspirators, who regularly robbed businesses, suspected that the owners kept the China Wok's business proceeds in their home because "they are Asian and they don't believe in banks." J.A. 1111. So Wiley and his coconspirators hatched a plan to rob the owners at home.

First, the group surveilled the China Wok and the owners' home. They decided that they would lay in wait in the bushes around the home and rob the owners when they returned from work. The group also agreed that each would carry a firearm. Hykeem Cox, a coconspirator, provided a firearm to a coconspirator who didn't have one.[1]

---

[1] Cox isn't a party in this appeal. He pleaded guilty pursuant to a plea agreement to conspiracy to interfere with commerce by threats or violence and attempt to do the same. He testified for the government in hopes of receiving a lesser sentence.

2

Next, Wiley secured a rental car, and the group waited outside the China Wok. When they saw the owners leave the restaurant, Wiley drove the group to the owners' home. But as they approached the front yard to hide, the owners' van pulled up. So the group retreated and went to a coconspirator's home to develop a new plan.

The group decided that rather than wait in the bushes, they would wait in the car until the owners got home. So two days after the aborted first attempt, Wiley secured a different rental car. After driving to the China Wok to confirm the owners were working, Wiley drove the group to the owners' home. They parked across the street and waited.

Soon after, the owners pulled up. Zheng waited in their van while Chan got out and walked to the front door. When the group saw a money bag in Chan's hands, they jumped out of the car and ran toward Chan and the van. They demanded the money and began firing. Chan retrieved a firearm by the front door and fired back. In the exchange of gunfire, Cox shot and killed Zheng.

## B.

### 1.

A grand jury charged Wiley with conspiracy to commit Hobbs Act robbery (count one), attempted Hobbs Act robbery (count two), conspiracy to possess firearms in furtherance of a crime of violence (count three), and possession of ammunition by a felon (count four).

Wiley moved to dismiss count three for failure to state an offense. That count alleged that Wiley conspired "to possess firearms in furtherance of a crime of violence, to wit: an offense under [18 U.S.C § 924(c)]; in violation of [18 U.S.C § 924(o)]." J.A. 27.

3

Wiley read this count as specifying the predicate crime of violence to be "an offense under [18 U.S.C § 924(c)]." He argued that a § 924(c) offense itself doesn't constitute a "crime of violence," as that term is defined by 18 U.S.C. § 924(c)(3).

The district court denied his motion. The court found that count three didn't specify a predicate crime of violence. Rather, the count quoted the statutory language of § 924(o), which prohibits conspiring to commit an offense under § 924(c).

2.

The case proceeded to trial. Before jury selection, prospective jurors completed questionnaires. As relevant to this appeal, question four asked, "Have you or any of your family members ever been a plaintiff or defendant in a court case (criminal, civil or domestic)?" *E.g.*, J.A. 1565. Based on their affirmative responses to that question, the government identified three jurors it wanted to question further during voir dire: Anitra Ingram, Linwood Brandis, and Janet Riddle.

The district court utilized the jury box system for voir dire. For each panel of prospective jurors, the court first asked each juror personal background questions. Then, it asked the whole panel some general questions, instructing jurors to raise a hand if their answer was "yes" so that it could ask follow-up questions. Last, the parties submitted specific follow-up questions for individual jurors or the entire panel.

The district court's general questions for the first panel asked (1) whether any jurors or their family or friends had been the victim of a crime, and (2) whether any jurors had taken part in a legal proceeding as a party or witness. Because these questions didn't fully cover the scope of question four, the government requested that the district court ask the

4

panel whether any jurors' *family or friends* had been a plaintiff or defendant in a *court* case. The district court instead asked the panel whether any *jurors* had been a party in a court case. The government subsequently requested that the court ask whether any jurors' family or friends had been a plaintiff or defendant in a *criminal* case.

Riddle didn't answer yes to any of these questions. Ingram did, but she didn't mention the details she provided on the questionnaire. Brandis too answered yes and offered the details he provided on the questionnaire. The government exercised peremptory strikes on Riddle and Ingram, both of whom are Black.

Wiley objected under *Batson v. Kentucky*, 476 U.S. 79 (1986). During the *Batson* bench hearing, the government said that it struck Riddle and Ingram because they didn't disclose orally the details they provided on the questionnaire to question four. But then the parties determined that the district court's questions, taken together, didn't fully cover question four. So the government requested that the district court ask the panel question four as it was worded on the questionnaire. The court did, but neither Riddle nor Ingram disclosed additional information.

Wiley renewed his objection to the government's challenges, which the district court denied. The final jury consisted of twelve members, seven who self-identified as white, four as Black, and one as mixed.

3.

Cox testified for the government at trial. He detailed Wiley's involvement in the offenses, including that Wiley (1) planned the robbery, (2) drove the rental cars, and (3) used a firearm. The government corroborated Cox's testimony with surveillance

5

footage, ballistics evidence, phone records, and data from the rental car's internal monitoring system.

At the close of the government's evidence, Wiley moved for a judgment of acquittal. The district court reserved ruling. Wiley renewed his motion after resting his case, and the court again reserved ruling.

4.

Before closing arguments, the parties submitted proposed jury instructions, one of which defined "reasonable doubt." The district court informed the parties that it would revise the proposed instruction on reasonable doubt because the "Fourth Circuit has made it very clear that I am not to define reasonable doubt." J.A. 842. It also cautioned them to "be careful what you argue in closing in terms of defining reasonable doubt." J.A. 843.

During closing argument, Wiley defined reasonable doubt as "the kind of evidence that you're going to rely on and act on in important matters." J.A. 1359. He then sought to show how Cox's lack of credibility would amount to reasonable doubt in an important matter. He spun a hypothetical where a juror's decision to invest money in a business opportunity hinged on Cox's "can't-fail business plan" and involvement. J.A 1359. The district court sustained the government's objection to the hypothetical and told the jury that it would instruct them on the standard for reasonable doubt.

5.

The jury found Wiley guilty on all counts except count four. Wiley renewed his motion for acquittal. He argued that there was insufficient evidence that he interfered with interstate commerce—a required element of each of his three convictions—and that there

6

was insufficient evidence of two conspiracies. He also argued that the district court's jury instruction constructively amended count three by specifying Hobbs Act robbery as the predicate crime of violence.

After post-verdict briefing, the court denied the motion. This appeal followed.

## II.

Wiley raises four challenges to his convictions. He argues that (1) the district court erred in denying his motion to dismiss count three for failure to state an offense and then constructively amended count three when instructing the jury; (2) the district court erred in denying his *Batson* challenges; (3) the district court violated his due process rights by prohibiting him from defining "reasonable doubt" during closing argument; and (4) the district court erred in finding that there was sufficient evidence to support his convictions. We consider each contention in turn.

## A.

We begin with Wiley's argument that the district court erred in denying his motion to dismiss count three for failure to state an offense, and then by constructively amending count three through its jury instructions. We review de novo whether an indictment properly charges an offense. *United States v. Darby*, 37 F.3d 1059, 1062 (4th Cir. 1994). We also review de novo whether the district court's jury instructions constructively amend the indictment. *See United States v. Whitfield*, 695 F.3d 288, 306 (4th Cir. 2012) (cleaned up).

7

1.

Wiley argues that count three is defective because it specifies an invalid predicate crime of violence offense. Count three alleges that Wiley conspired "to possess firearms in furtherance of a crime of violence, to wit: an offense under [18 U.S.C. § 924(c)]; in violation of [18 U.S.C. § 924(o)]." J.A. 27. According to Wiley, the indictment specifies "an offense under [18 U.S.C. § 924(c)]" as the predicate crime of violence offense. But he argues that a violation of § 924(c) alone doesn't constitute a crime of violence. Wiley misreads the indictment.

Section 924(o) provides that "[a] person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both." Under § 924(c)(1)(A), it's a crime to use, carry, or possess a firearm "during and in relation to any crime of violence." Section 924(c)(3)(A) defines a "crime of violence" as any felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."[2]

These statutes, read together, inform our understanding of Wiley's indictment. Simply put, count three alleges that Wiley conspired to commit an offense under § 924(c), in violation of § 924(o). Thus, Wiley's indictment alleges the statutory conspiracy offense

---

[2] Section 924(c)(3) provides two definitions for "crime of violence." The definition provided by § 924(c)(3)(A) is known as "the force clause," and the definition provided by § 924(c)(3)(B) is known as "the residual clause." In *United States v. Davis*, the Supreme Court held that the residual clause is unconstitutionally vague. 139 S. Ct. 2319, 2336 (2019).

proscribed by § 924(o) by mirroring the statute's wording. But it doesn't specify a predicate crime of violence offense.

We've said that the government isn't required to specify a predicate crime of violence offense in an indictment for a § 924(c) offense. *United States v. Randall*, 171 F.3d 195, 208 (4th Cir. 1999) (cleaned up). Nor must it separately charge the defendant with the predicate crime of violence offense. *Id.* (cleaned up). Because § 924(o) "is simply the conspiracy form of § 924(c)," *United States v. Said*, 26 F.4th 653, 658 n.8 (4th Cir. 2022), these same rules apply when the government charges a § 924(o) offense.

We thus reject Wiley's argument that count three is invalid because it failed to state an offense.

2.

Wiley also argues that the district court's jury instructions constructively amended count three by specifying Hobbs Act robbery as the predicate crime of violence. "The Fifth Amendment guarantees that a criminal defendant will be tried only on charges in a grand jury indictment." *United States v. Burfoot*, 899 F.3d 326, 338 (4th Cir. 2018) (cleaned up). Neither the government, through its presentation of evidence, nor the district court, through its jury instructions, can broaden the bases for conviction. *Randall*, 171 F.3d at 203 (cleaned up). So when the government specifies a predicate crime of violence offense in an indictment, a conviction must be based on that specified predicate. *Id.* at 210.

But as in this case, the government isn't required to specify a predicate crime of violence offense in an indictment. *Id.* at 208. At trial, the government's theory as to count three was that Wiley conspired to possess firearms in furtherance of a Hobbs Act robbery.

9

In instructing the jury, the district court explained that the government needed to prove the essential elements of the offense, including that "two or more persons agreed to possess a firearm or firearms in furtherance of a crime of violence which may be prosecuted in federal court." J.A. 1389. The district court then advised that Hobbs Act robbery is a crime of violence.

In doing so, the district court didn't constructively amend the indictment. Rather, it specified for the jury the predicate crime of violence offense that the government sought to establish at trial in the first instance.

B.

1.

Next, we consider Wiley's argument that the district court erred in denying his *Batson* challenges. We review for clear error a district court's determination of whether a peremptory challenge was exercised for a racially discriminatory reason. *United States v. Dinkins*, 691 F.3d 358, 379–80 (4th Cir. 2012) (cleaned up).

The three-step process for adjudicating a *Batson* claim is well-established: First, the defendant makes a prima facie showing that a peremptory challenge has been exercised on the basis of race. *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 328 (2003) (cleaned up). Second, the government offers a race-neutral explanation for striking the juror. *Id.* (cleaned up). Third, the district court determines whether the defendant has shown purposeful discrimination. *Id.* at 329 (cleaned up).

With this framework in mind, we turn to Wiley's argument.

10

2.

Because the government offered a race-neutral explanation in the district court, we assume, without deciding, that Wiley established a prima facie showing of discrimination at step one. *See Dinkins*, 691 F.3d at 380 n.17 (cleaned up).

The government explained that it struck Riddle and Ingram because they didn't disclose fully in court their answers to question four on the questionnaire. In Riddle's case, she stated on her questionnaire that her brother had been convicted of a criminal offense. But she didn't disclose this in court. Ingram stated on her questionnaire that both her uncle and sister had been a part of a court case. In court, she disclosed information about her uncle, but not about her sister.

This explanation is facially race neutral. *See Hernandez v. New York*, 500 U.S. 352, 360 (1991) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").

To convince the district court otherwise, Wiley had to show that this explanation was "merely pretextual" and that the government's "real reason" for striking the jurors was because of their race. *United States v. McMillon*, 14 F.3d 948, 953 (4th Cir. 1994). To support pretext, Wiley argues that the government's reason for striking Riddle and Ingram applied equally to a white juror, Brandis, who wasn't struck.[3]

---

[3] Wiley didn't make this argument at trial, which likely means he forfeited it. *See, e.g.*, *United States v. Mahbub*, 818 F.3d 213, 229 (6th Cir. 2016) (cleaned up); *United States v. Gibson*, 105 F.3d 1229, 1232 (8th Cir. 1997) (cleaned up). In any event, the argument fails on the merits.

A defendant can establish purposeful discrimination by showing that the government's race-neutral reason for striking the Black jurors applied to white jurors who weren't struck. *Miller-El v. Drekte* (*Miller-El II*), 545 U.S. 231, 241 (2005) (cleaned up). In *Miller-El II*, the government claimed that it struck a Black juror because he expressed hesitancy about the death penalty. *Id.* at 243. Although facially race neutral, the Supreme Court found that this explanation was pretextual because white jurors who expressed similar beliefs weren't struck. *Id.* at 244–45.

Here, though, the government's reason for striking Riddle and Ingram doesn't equally apply to Brandis. When questioned by the district court, Brandis (unlike Ingram and Riddle) disclosed fully the answer he gave to question four on the questionnaire— "Have you or any of your family members ever been a plaintiff or defendant in a court case (criminal, civil or domestic)?" J.A. 1567.

It's true that when the district court asked all jurors question four verbatim, Brandis didn't raise his hand. But by then, he had disclosed his answer to that question. Riddle and Ingram, though, didn't raise their hands despite not having disclosed all the information from their questionnaires. Because Brandis isn't similarly situated to the two jurors who were challenged, Wiley fails to show that the government acted with discriminatory intent.

3.

Next, Wiley argues that the government's disparate questioning and trickery shows discriminatory intent.

Evidence of the government's disparate questioning of Black and white jurors is probative of discriminatory intent. *See Miller-El I*, 537 U.S. at 344. In *Miller-El I*, for

12

example, before asking jurors their feelings about the death penalty, the government more often provided a graphic description of the execution process to Black jurors than white jurors, with 53% of Black jurors hearing the graphic script compared to 6% of white jurors. *Id.* And although all prospective jurors were asked the lowest sentence they would consider for murder, the government informed 94% of white jurors of the statutory minimum sentence beforehand, compared to only 12.5% of Black jurors. *Id.* at 333, 345.

On those facts, the Court held that the government's explanation for striking Black jurors based on their ambivalence toward the death penalty was pretextual because its disparate questioning created the (potentially false) appearance of divergent opinions on the death penalty among the jurors. *Miller-El II*, 545 U.S. at 260–63.

Wiley contends that the government similarly targeted Black jurors (1) by requesting that the district court ask question four only when a Black juror was on the panel, and (2) by repeating a question that the jurors had answered in the questionnaire to elicit inconsistent answers. We don't agree.

Here, any disparity in the form of the questions is explained by how the district court conducted the voir dire. The district court asked the first panel of prospective jurors a set of general questions and then the follow-up questions that the parties submitted. But as new panel members were called into the box, the district court didn't repeat these questions. Instead, it would ask the new panelists (who had been sitting in the courtroom) to raise their hand if they would have answered "yes" to any of the questions asked earlier. When the district court did that, the government didn't request question four as a follow up. On

13

the other hand, when the district court repeated the questions, but omitted question four, the government requested that the court ask the question.

We also reject Wiley's argument that because question four was on the questionnaire, the government's insistence on asking it again during voir dire was a trap for Black jurors. We don't think that argument is persuasive, particularly since every prospective juror was asked question four, whether directly or by the court's referencing its previous questions.

We acknowledge that the better practice may have been for the government to ask Riddle and Ingram directly about any inconsistencies between their questionnaires and oral responses. When the government is concerned about a particular subject, we expect it to engage in meaningful questioning and attempt to clear up any potential misunderstandings before exercising a strike. *See id.* at 244–46. But the government's failure to do so here doesn't prove discriminatory intent. *See United States v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989) ("The decision not to ask follow-up questions is a matter of trial strategy; failure to do so is not dispositive of the thoughtfulness of the prosecution's exercise of its peremptory strikes.").

We find no clear error in the district court's denial of Wiley's *Batson* claim.

C.

Next, we consider Wiley's argument that the district court violated his due process rights by not allowing him to define "reasonable doubt" in his closing argument. During closing argument, Wiley's counsel defined "reasonable doubt" as the "evidence that you're going to rely on and act on in important matters." J.A. 1359. He then offered a hypothetical

14

where the juror's decision to invest money in a business opportunity hinged on Cox's "can't-fail business plan." J.A. 1359. Counsel predicted that the jurors would "run screaming" from the deal, and concluded, "[I]f you wouldn't trust him in a business deal, why would you trust his word in this case?" J.A. 1360.

Wiley claims that the hypothetical was correct in law because it was based on an accepted definition of proof beyond a reasonable doubt. He argues that by sustaining the government's objection to the hypothetical, the district court conveyed to the jury a standard of proof that was less than proof beyond a reasonable doubt. We reject this argument.

We've long maintained that district courts shouldn't attempt to define "reasonable doubt." *See United States v. Oriakhi*, 57 F.3d 1290, 1300 (4th Cir. 1995) (cleaned up). "[R]easonable doubt" has a "self-evident meaning comprehensible to the lay juror." *Murphy v. Holland*, 776 F.2d 470, 475 (4th Cir. 1985), *vacated on other grounds*, 475 U.S. 1138 (1986). So attempts to explain the term tend "to alter or to obfuscate" its meaning. *Oriakhi*, 57 F.3d at 1300 (cleaned up). Thus, the district court can restrict counsel from defining the term in closing argument. *See, e.g.*, *United States v. Crockett*, 813 F.2d 1310, 1317 (4th Cir. 1987) (citing *Herring v. New York*, 422 U.S. 853, 862 (1975)).

Indeed, a district court has broad authority to limit closing argument to ensure that it doesn't "impede the fair and orderly conduct of the trial." *Id.* (quoting *Herring*, 422 U.S. at 862). Accordingly, we review a district court's limitation on closing argument for abuse of discretion. *Id.*

15

We've said that any definition of "reasonable doubt" is "more confusing than helpful." *Id.* So the district court's refusal to permit such definitions in closing argument is presumptively reasonable. Here, the district court correctly expressed concern about whether the standard for entering a business deal is properly judged by reasonable doubt, especially because "people may enter into business deals for different reasons." J.A. 1362.

We also reject Wiley's argument that by exercising its discretion, the district court signaled to the jury that the definition on which the hypothetical relied was incorrect. Wiley tried to define "reasonable doubt" after being explicitly warned by the district court against doing so. In response, the district court told the jury that it would instruct them on reasonable doubt, and it subsequently provided an appropriate instruction.

The district court's handling of the issue was well within its discretion.

D.

Finally, Wiley challenges the sufficiency of the evidence supporting his convictions. First, for his conspiracy to possess firearms conviction (count three), he claims that there was insufficient evidence of a separate agreement to possess firearms. Second, for all three of his convictions, he claims that there was insufficient evidence to establish the interstate commerce nexus required under the Hobbs Act.

We review the denial of a motion for acquittal de novo. *United States v. Buzzard*, 1 F.4th 198, 204 (4th Cir. 2021) (cleaned up). We review the evidence in the light most favorable to the government. *Id.* at 205 (cleaned up). We can't consider the credibility of witnesses, and we assume that the jury resolved any contradictions in testimony in the government's favor. *Burfoot*, 899 F.3d at 334 (cleaned up). We can reverse only if "no

16

reasonable juror could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Robertson*, 68 F.4th 855, 862 (4th Cir. 2023) (cleaned up).

1.

Wiley contends that the government presented evidence of a single conspiracy to commit an armed robbery against the owners of the China Wok. According to Wiley, there was insufficient evidence of a separate agreement to possess firearms. Thus, sentencing him for two conspiracies violated the Double Jeopardy Clause of the Fifth Amendment. We disagree.

Wiley was convicted of violating § 1951(a) and § 924(o). Section 1951(a) proscribes Hobbs Act robbery conspiracy and authorizes a sentence of imprisonment for not more than twenty years. Section 924(o) proscribes firearms conspiracy and also authorizes a sentence of imprisonment for not more than twenty years.

Wiley doesn't dispute that each statutory provision authorizes a separate punishment. Rather, he claims that because these convictions arose from a single agreement, he can't be punished under both provisions. Not so.

The Double Jeopardy Clause "protects against multiple punishments for the same offense." *United States v. Ayala*, 601 F.3d 256, 264 (4th Cir. 2010) (cleaned up). But the Clause doesn't prohibit Congress from punishing the same course of conduct under different statutes. *Id.* at 265 (cleaned up). When a single act violates two distinct statutory provisions, the district court may impose multiple punishments without violating the Clause if Congress authorizes it to do so. *Id.*

17

To determine Congress's intent, we apply the rule in *Blockburger v. United States*, 284 U.S. 299 (1932). *Blockburger* explains that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304 (cleaned up). If each contains an element that the other doesn't, then *Blockburger* is satisfied, and we presume that Congress authorized multiple punishments. *United States v. Terry*, 86 F.3d 353, 356 (4th Cir. 1996) (cleaned up); *see also United States v. Albernaz*, 450 U.S. 333, 339 (1981).

In applying *Blockburger*, we look at the elements of the statutory provisions in question—not the particular facts offered to convict. *See United States v. Allen*, 13 F.3d 105, 109 n.4 (4th Cir. 1993) (cleaned up).

Section 1951(a) requires proof of an agreement to commit a robbery of a business engaged in interstate commerce. Section 924(o) requires proof of an agreement to possess or use firearms in furtherance of a crime violence, here Hobbs Act robbery. *See United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010). Although § 924(o) requires proof of an intent to commit an underlying crime of violence, it doesn't require an agreement to do so. *See United States v. Morehead*, 959 F.2d 1489, 1508–09 (10th Cir. 1992).

In short, these statutes "specify different ends as the proscribed object of the conspiracy." *Albernaz*, 450 U.S. at 339. And each requires proof of a fact that the other doesn't. *Cf. United States v. Khan*, 461 F.3d 477, 488 n.5 (4th Cir. 2006) (holding that a defendant could be punished separately for conspiracy to enlist in armed conflict against

18

the United States and firearms conspiracy, where the former served as a predicate crime of violence for the latter). As a result, *Blockburger* is satisfied.

So the government could charge and convict Wiley for the two separate conspiracy offenses even if they arose from a single agreement. *See Albernaz*, 450 U.S. at 344 n.3 (cleaned up). And here, there's sufficient evidence that Wiley entered into an agreement that contemplated both Hobbs Act robbery and using a firearm to further that robbery.

Wiley counters that by charging him with two counts of conspiracy—Hobbs Act conspiracy and firearms conspiracy—the government needed to prove that he entered two distinct conspiracies. This is incorrect.

Our holding in *United States v. Manbeck*, 744 F.2d 360 (4th Cir. 1984), explains why. There, the government charged the defendants with two counts of conspiracy—conspiracy to import marijuana and conspiracy to distribute it. *Id.* at 386–87. But the events which gave rise to the two offenses "evolved from" the same agreement. *Id.* at 387. We said that to convict the defendants of both conspiracy offenses, the government didn't need to prove that "two distinct and separate conspiracies were entered into." *See id.* Rather, it needed to prove that they entered an "agreement that encompassed distribution as well as importation." *Id.*; *cf. Am. Tobacco Co. v. United States*, 328 U.S. 781, 788 (1946). So too here.

To prove a conspiracy, the government must show that the defendant entered an agreement to commit a crime. *See, e.g.*, *United States v. Laughman*, 618 F.2d 1067, 1074 (4th Cir. 1980) (cleaned up). Given the "clandestine and covert" nature of conspiracies,

19

the government must often rely exclusively on circumstantial evidence. *United States v. Garcia-Lagunas*, 835 F.3d 479, 490 (4th Cir. 2016) (cleaned up).

Thus, a "tacit or mutual understanding" among coconspirators is sufficient evidence of an agreement. *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (cleaned up). And a defendant's presence at the scene of a crime as well as his acquaintance with coconspirators is "material and probative" in determining his participation in a conspiracy. *United States v. Burgos*, 94 F.3d 849, 869–70 (4th Cir. 1996) (cleaned up).

Here, Cox testified that the coconspirators agreed to rob the China Wok and then hatched a plan to do so. And as part of the plan, the coconspirators agreed that everyone would be armed. Finally, Cox provided a firearm to a coconspirator who didn't have one.

When asked, "Was that the agreement between you . . . to have guns to commit a robbery?" Cox said yes. J.A. 1114. And when asked, "Why did you have guns?" Cox responded, "Because we was [sic] going to commit a robbery." J.A. 1114. Social media records showed that Cox possessed and sold four handguns the same week as the robbery. Ballistics evidence and expert testimony showed that four distinct firearms, not including Chan's, were fired on the night of the robbery. And GPS evidence and phone records placed Wiley at the scene.

Drawing inferences from this evidence in the light most favorable to the government, a reasonable juror could conclude that Wiley and his coconspirators agreed to rob the China Wok and to use firearms to execute the robbery—in violation of two distinct conspiracy statutes. Because Congress intended to impose separate punishments for these offenses, Wiley's sentence doesn't violate double jeopardy.

20

2.

Next, Wiley contends that there wasn't sufficient evidence to show the required interstate commerce nexus for Hobbs Act robbery. An essential element of any Hobbs Act offense is that the defendant "obstructs, delays, or affects commerce." 18 U.S.C. § 1951(a). All three of Wiley's convictions required proof that he interfered with interstate commerce. Such proof exists here.

To establish the jurisdictional predicate of the Hobbs Act, the government must prove a minimal effect on interest commerce. *See United States v. Taylor*, 754 F.3d 217, 222 (4th Cir. 2014) (cleaned up). One way the government can do so is by showing that the defendant intentionally targeted the victim because the defendant believed that he would obtain business proceeds. *See id.* at 225.

In recognizing the targeting theory in *Taylor*, we relied heavily on *United States v. Powell*, 693 F.3d 398 (3d Cir. 2012), a case much like this one. There, the coconspirators robbed Asian business owners in their homes because they believed that the owners didn't use banks. *Id.* at 399. The Third Circuit found that even though the robberies occurred at the victims' homes, they were still directed at business establishments, which satisfied the jurisdictional nexus. *Id.* at 403–04.

Here, the government presented evidence that Wiley and his coconspirators conspired to rob Chan and Zheng because the group was targeting the proceeds of the China Wok. Cox testified that he and the other coconspirators regularly "stalk[ed] businesses" to rob and that they set their eyes on the China Wok because they heard that it had a lot of

21

money.  J.A. 1110.  Cox also expressly testified that the group intended to rob the owners of "money" from "their business."  J.A. 1115.

As in *Powell* and *Taylor*, this evidence is sufficient to show that Wiley and his coconspirators targeted the proceeds of a business engaged in interstate commerce.

Wiley's reliance on *United States v. Wang*, 222 F.3d 234 (6th Cir. 2000), to urge a different result fails to persuade.  We haven't adopted our sister circuit's requirement that when an offense under the Hobbs Act targets an individual victim, the government must prove a "substantial" connection between the victim and a business engaged in interstate commerce.  *Id.* at 239.  Even so, in *Wang*, the Sixth Circuit acknowledged that its heightened standard could be satisfied where "the defendant knew of or was motivated by the individual victim's connection to interstate commerce." *Id.*  So *Wang* offers Wiley no refuge.

And under the targeting theory, it doesn't matter that the robbery occurred at Chan and Zheng's home.  *See, e.g.*, *United State v. Thorpe*, 803 F. App'x. 691, 693 (4th Cir. 2020) (per curiam); *United States v. Singleton*, 178 F. App'x 259, 263–64 (4th Cir. 2006).

At bottom, what matters is the defendant's intent to target the proceeds. *Id.* That's precisely what happened here.

### III.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

22