**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-4680**

———————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

GUY BENJAMIN BOWMAN,

        Defendant – Appellant.

———————

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, Senior District Judge. (1:22-cr-00021-JPJ-PMS-1)

———————

Argued: March 5, 2024                       Decided: July 1, 2024

———————

Before DIAZ, Chief Judge, and RICHARDSON and RUSHING, Circuit Judges.

———————

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Chief Judge Diaz and Judge Rushing joined.

———————

**ARGUED:** James R. Theuer, JAMES R. THEUER, PLLC, Norfolk, Virginia, for Appellant. Jonathan Patrick Jones, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee. **ON BRIEF:** Christopher R. Kavanaugh, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

A jury convicted Guy Bowman of distributing methamphetamine as well as conspiring to do so. He now appeals those convictions, arguing that the district court erred before and during his trial. We disagree and thus affirm his convictions.

I.    Background

In March 2022, law-enforcement officers executed a search warrant on a property in Meadowview, Virginia, where Bowman and his girlfriend, Sally Carr, lived. The search was a part of an investigation into the couple for the distribution of methamphetamine. And the search, which encompassed the residence and vehicles, yielded evidence of that crime. Among other items, officers found (1) three vacuum-sealed bags containing 997 grams of meth in Bowman's Mercedes,[1] (2) a cell phone in a lock box, and (3) a notebook in a drawer recording how many "8 balls"[2] were sold, the price for which they were sold, and when the buyer would pay the balance. Carr arrived as officers searched the property. But Bowman was nowhere to be found.

Officers located Bowman later that day at the Deluxe Inn in nearby Bristol, Virginia. Officers patrolling the area found Bowman outside the hotel in his Jeep, and—pursuant to an arrest warrant and a search warrant for his person—detained and handcuffed him. A

---

[1] Among other evidence showing the Mercedes was Bowman's, officers found a receipt and temporary registration for the Mercedes in Bowman's Jeep.

[2] As explained at trial, "[a]n 8 ball is a slang term for an eighth of an ounce or 3.5 grams" and is "indicative of a user quantity." J.A. 483–84.

2

search of Bowman's person yielded $7,108 in cash and another cell phone that was later revealed to contain messages about drug dealing.

Officers then took Bowman into a hotel room to talk. As they entered the room, Bowman proclaimed, "I am good at what I do, and I'm connected with the Sinaloa Cartel."[3] J.A. 503. Surprised by this unprompted assertion, the lead investigator, Drug Enforcement Agency Special Agent Brian Snedeker, stopped Bowman from saying anything else, got a *Miranda* card, read Bowman his *Miranda* rights, then asked Bowman if he wanted to talk to the officers. Bowman said yes. Not once during this process did Bowman ask for a lawyer.

Bowman proceeded to tell officers that "he sold drugs for a living." J.A. 511. Specifically, he said that the meth officers found pursuant to the search warrant was his and that it was part of twenty pounds of meth that he had transported from California to Virginia with the intent to sell. This meth, he said, originated from the Sinaloa Cartel. He had transported the meth to Virginia by concealing it inside a spare tire on his Jeep. And this twenty-pound supply was only part of Bowman's larger drug-trafficking operation. In the prior year, he estimated that he had shipped between 150 and 200 pounds of meth from California to Virginia. Officers arrested Bowman after the interview.

Based on this evidence, Agent Snedeker swore out a criminal complaint against Bowman, and Bowman and Carr were jointly indicted on two counts. Count One alleged that the pair conspired to distribute and possess with intent to distribute 500 grams or more

---

[3] The Sinaloa Cartel is "[a] well known Mexican drug trafficking cartel." J.A. 506.

3

of a substance containing meth in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(viii).  Count Two alleged the corresponding substantive offense: that both distributed and possessed with intent to distribute 500 grams or more of a substance containing meth in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).

Jail didn't keep Bowman and Carr from talking.  Rather, the two continued to communicate via the jail phones.  Over the course of four phone calls, Bowman instructed Carr to collect drug debts for him and once again admitted that he sold drugs for a living.

Eventually, Bowman's and Carr's approaches to their prosecution diverged.  Carr pleaded guilty to Count Two, resulting in the dismissal of Count One against her.  But Bowman proceeded to trial.  And, after two court-appointed attorneys withdrew from representing him, he chose to proceed *pro se*—despite a magistrate judge's advice to the contrary.

Before trial, Bowman filed a motion to suppress the initial statements he made to Agent Snedeker.  He did not assert any facts that contradicted the above-described rendition of Agent Snedeker's interaction with him.  Instead, he argued that the statements that he "is good at what [he] do[es]" and that he is "connected with the Sinaloa Cartel" should be suppressed because he made them before he was read his *Miranda* rights.

The district court denied the motion without holding an evidentiary hearing. "*Miranda* protections," it explained, "are available only to those who are interrogated by law enforcement officers while in custody."  J.A. 735.  Because Bowman alleged no facts indicating that he was interrogated before he made the statements in question, the district court determined that there was no basis to suppress them.

4

Then came trial, starting with jury selection. The district court itself asked prospective jurors questions. It asked about jurors' experiences that may impact their impartiality—*e.g.*, experiences with Bowman, drug offenses, and law enforcement. As catchalls, the district court asked the prospective jurors, "Do any of you know of any reason why you could not decide this case solely on the evidence and the law that I'll tell you about without regard to sympathy, bias, or prejudice?"; "[D]o any of you have any religious or personal belief that would make it difficult for you to sit in judgment as a juror of someone else?"; and "Do any of you know of any reason, even a reason that I've not asked you about, that would make it difficult for you to be fair and impartial in this case?" J.A. 182–83. As a result of these questions, some jurors were excused for cause.

After the district court asked its questions and prospective jurors exited the courtroom, Bowman proposed five more questions for the district court to ask. Those questions were:

1) "Should law enforcement have to abide by the same hunting and fishing regulations as everybody else?";

2) "Do you believe it's okay to stereotype people?";

3) "What do you think about black and white marriage?";

4) "Do you believe in common law marriage?"; and

5) "Do you think it's right for the government to use scare tactics?"

J.A. 187. The district court declined to ask any of them.

The final step of jury selection was to bring the prospective jurors back to the courtroom for peremptory strikes. The Government got six, and Bowman ten. *See* Fed. R.

5

Crim. P. 24(b)(2). The district court provided both parties with a juror strike list. At some point, Bowman noticed that the Government had another list with more information about the jurors than was included on the strike list. The strike list only had each prospective juror's name, city and county of residence, and occupation. But before trial, the Government had been provided a list with that information, plus address, education level, name of employer, year of birth, race, marital status, spouse's occupation, and number of children. So Bowman protested. The district court didn't address the issue, but asked Bowman if he was going to proceed with his peremptory strikes. Bowman continued to protest, refusing to make his remaining strikes because the Government possessed additional information. In the end, the district court made Bowman's remaining strikes for him.

Once the jurors were chosen and opening statements were made, the Government put on its case-in-chief. It presented various law-enforcement agents as witnesses, including Agent Snedeker, and they testified consistently with the facts described above. In addition, Agent Snedeker testified about what he had learned about drug traffickers through his experience as an agent. Namely, he explained that drug traffickers (1) "routinely take vehicles in as trades" for drugs and thus routinely have multiple vehicles, J.A. 481, (2) "oftentimes possess multiple cell phones," J.A. 497, and (3) use digital scales to "weigh the product that they're selling," J.A. 500. This testimony corresponded to evidence that Bowman had multiple vehicles, was found with multiple cell phones, and had a photo of a digital scale on one of those cell phones.

6

For his case-in-chief, Bowman called two witnesses. The first was Carr. Once on the stand, however, Carr and her attorney told the district court she wanted to exercise her Fifth Amendment right not to testify. The district court accepted Carr's request, explaining that Carr hadn't yet been sentenced and her "testimony . . . would . . . relate[] to her alleged involvement in the charges against her." J.A. 660. Bowman's only other witness was Jennifer Morrison, who testified that Bowman bought tires from her. Bowman's questioning indicated that he intended Morrison's testimony to show that he sold cars, rather than drugs, for a living.

At closing, both Bowman and the Government summarized the evidence and their arguments. The Government augmented its closing argument by replaying portions of two jail calls between Bowman and Carr. In reaction, Bowman asked to play the entirety of the four recorded jail calls during his closing argument. The district court said no because it believed that only parts of the calls had been admitted into evidence. But, after Bowman finished his argument, the district court realized it had made a mistake—the entirety of the four calls had been admitted into evidence. So the district court conferenced with the parties about how to go forward.

The Government explained that each call was about 16 minutes long, meaning playing the whole of each would take an hour. Bowman couldn't pinpoint any part or parts of the calls he wished to play; he only wanted the full calls played because the jury could only "understand[] . . . what was really going on" if it heard "the whole phone call." J.A. 696. The district court chose a middle ground and, rather than playing the calls during closing, told the jury how to access the recordings and that Bowman wanted them to listen

7

to each in its entirety because the portions played during the Government's argument were "out of context." J.A. 699.

After deliberation, the jury found Bowman guilty on both counts. Bowman was later sentenced to 360 months' imprisonment. This appeal followed.

## II.    Discussion

Bowman urges us to vacate his sentence and convictions and remand for a new trial based on various errors by the district court. None of those alleged errors, however, are in fact errors. So we affirm.

### A.    Evidentiary Hearing

Bowman's first argument is that the district court erred when it failed to hold an evidentiary hearing on his suppression motion. It did not.

District courts need not conduct an evidentiary hearing on all suppression motions. Fed. R. Crim. P. 12(c)(1) ("The court *may* . . . schedule a motion hearing." (emphasis added)). The decision whether to conduct one is instead "left to the sound discretion of the district court, and we will review that decision only for an abuse of discretion." *United States v. Pridgen*, 64 F.3d 147, 150 (4th Cir. 1995).[4]

This is not to say, though, that an evidentiary hearing is never required. *Cf. United States v. Raddatz*, 447 U.S. 667, 677 (1980) ("The guarantees of due process call for a 'hearing appropriate to the nature of the case.'" (quoting *Mullane v. Cent. Hanover Bank*

---

[4] The Government contends that we should review only for plain error since Bowman did not object below to the court's not holding a hearing. But we need not decide whether Bowman preserved this issue because it fails even under the more forgiving abuse-of-discretion standard.

*& Tr. Co.*, 339 U.S. 306, 313 (1950))).  In ruling on a suppression motion, a district court is both the factfinder and the decider-of-law.  *See United States v. Stevenson*, 396 F.3d 538, 541 (4th. Cir. 2005).  When the facts underlying the motion are clear and undisputed, an evidentiary hearing provides little value.  Yet when critical facts are disputed, an evidentiary hearing can be helpful—for the district court must then "resolve conflicts in testimony, weigh the evidence, and judge the credibility of witnesses."  *See United States v. Manbeck*, 744 F.2d 360, 392 (4th Cir. 1984).

Accordingly, a district court must hold an evidentiary hearing on a suppression motion only if the motion raises a material factual dispute.  *United States v. Taylor*, 13 F.3d 786, 789 (4th Cir. 1994).  In other words, a hearing is required when the motion asserts facts that (1) are disputed and unresolvable on the record and (2) will affect the resolution of the constitutional claim.  *Id.*; *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010).  As the defendant bears the burden of proof on a motion to suppress, *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981), he too bears the burden of asserting disputed material facts in his motion.

Here, Bowman presented no material factual dispute in his suppression motion.  The motion only asserted that his statements should be suppressed because he made them before he was *Mirandized*.  The Government did not contest that order of events.  So the district court didn't have to hold an evidentiary hearing—it needed only to resolve the *legal* dispute of whether, taking the facts as the parties agreed them to be, Bowman's Fifth Amendment rights were violated.

9

And it rightly concluded that they were not.  The Fifth Amendment is implicated only when a suspect is both in custody *and* subject to official interrogation.  *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007).  The Government asserted that Bowman made his statements spontaneously.  Bowman's motion, in turn, did not allege any facts that suggested that his statements were made in response to "express questioning or its functional equivalent."[5]  *See id*. (quotation omitted).  So he failed to allege that there were any material factual disputes warranting a hearing.

Although he acknowledges that his motion contained no contested factual allegations, Bowman argues that the district court still erred for two reasons.  For one, he contends that he wasn't able to develop evidence in support of suppression before filing his motion because he lacked sufficient access to discovery.  For two, he points out that, during trial, he said that he had requested a lawyer before he made the statements, which evidences a material factual dispute on the suppression issue.

These arguments are beside the point.  Even if Bowman's ability to access discovery was limited, that would not have prevented him from *alleging* material facts in his motion.  If he remembered officers asking him questions before he made his statements, he could have alleged that fact.  He did not need to *prove* facts in his motion to meet the burden

---

[5] We reach this conclusion even considering our liberal construction of *pro se* motions.  *United States v. Wilson*, 699 F.3d 789, 797 (4th Cir. 2012).  Bowman, in fact, does not argue on appeal that his motion could be read to allege any facts that differed from the Government's, let alone any facts that showed he was interrogated.  While the law rightfully requires courts to give *pro se* defendants' submissions the benefit of the doubt, it doesn't require courts to dream up factual assertions that the defendant could have made to support an evidentiary hearing.

required to get an evidentiary hearing. And, as to his second argument, the mere fact that Bowman might have at some point requested counsel is immaterial here. *See Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (holding that *Miranda* doesn't apply—even after a request for counsel—when "the accused himself initiates further communication, exchanges, or conversations with the police"). Again, the facts and allegations available to the district court established that Bowman's confession was uttered spontaneously, meaning any factual dispute about a prior request for counsel, even assuming there was such a dispute, would not have affected the resolution of Bowman's constitutional claim.

In summary, the district court didn't need to resolve any factual disputes to decide Bowman's motion. So it didn't abuse its discretion by rejecting it without an evidentiary hearing.

### B.      Jury Selection

Next, Bowman argues that, during jury selection, the district court impaired his constitutional right to a fair and impartial jury in two ways: by refusing to ask the jury pool his proposed questions and by providing him with a juror list containing less information than what was provided to the Government. Yet neither of these actions violated Bowman's constitutional rights.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . an impartial jury." U.S. Const. amend. VI. This right is partially protected by jury selection, during which a trial judge "ensur[es] that jurors have 'no bias or prejudice that would prevent them from returning a verdict according to the law and

11

evidence.'"[6]  *United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)).  And the Supreme Court has "repeatedly said that jury selection falls 'particularly within the province of the trial judge."  *Id.* (quoting *Skilling*, 561 U.S. at 386).  That's because, during jury selection, a "trial judge's function . . . is not unlike that of [a] juror[]. . . .  Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion); *accord id.* at 194 (Rehnquist, J., concurring in result); *Tsarnaev*, 595 U.S. at 312–13.

### 1.      *Voir Dire*

*Voir dire*, or "to speak the truth," refers to the questioning of potential jurors during jury selection.[7]  The Constitution requires that this questioning be sufficient "to enable

---

[6] The Supreme Court has sometimes grounded the need for an impartial jury in the Fifth and Fourteenth Amendments' Due Process Clauses.  *See Turner v. Murray*, 476 U.S. 28, 36 n.9 (1986); *United States v. Skilling*, 561 U.S. 358, 377–79 (2010); *United States v. Malloy*, 758 F.2d 979, 981–82 (4th Cir. 1985).  The Court has explained that those clauses "protect[] against criminal trials . . . conducted . . . in a way that necessarily prevents a fair trial."  *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944) (cleaned up).  And a trial is necessarily unfair if jury selection doesn't root out biased jurors.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("A fair trial in a fair tribunal is a basic requirement of due process. . . .  In the ultimate analysis, only the jury can strip a man of his liberty or his life. . . .  [So] a juror must be as indifferent as he stands unsworn." (quotations and citations omitted)).

[7] The court may question the jurors itself or supervise the attorney's questioning.  *Cf. Skilling*, 561 U.S. at 372–73 (discussing the trial judge's rejection of the need for questioning by counsel and noting the trial judge's explanation that jurors provide more forthcoming responses to judge-led questioning).  Federal Rule of Criminal Procedure 24(a)(1) provides that "[t]he court may examine prospective jurors or may permit the attorneys for the parties to do so."  Where, as here, the court chooses the former, it must permit the parties to either "ask further questions that the court considers proper" or (Continued)

[district courts] 'to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence.'" *United States v. Caro*, 597 F.3d 608, 614 (4th Cir. 2010) (quoting *Rosales-Lopez*, 451 U.S. at 188 (plurality opinion)). Yet the Constitution does not dictate "the necessary depth or breadth" of questions. *Skilling*, 561 U.S. at 386. Instead, district courts have broad discretion to determine what questioning is sufficient. *Id*.

Here, Bowman argues that the district court was constitutionally required to ask the questions that "addressed racial prejudice"[8] because the jury pool was all White and Bowman is Black. Appellant's Br. at 15. He thus contends that the district court's failure to ask his questions amounted to a constitutional error.

The Constitution does sometimes mandate that a district court ask potential jurors about racial prejudice. But those cases are limited to the narrow circumstance where racial issues are "inextricably bound up with the conduct of a trial" and the defendant has requested such questioning. *United States v. Barber*, 80 F.3d 964, 968 (4th Cir. 1996) (en

---

"submit further questions that the court may ask if it considers them proper." Fed. R. Crim. P. 24(a)(2).

[8] Bowman's arguments on appeal challenge the district court's refusal to ask his questions writ-large. But only one of Bowman's five questions addressed race explicitly ("What do you think about black and white marriage?"). J.A. 187. Another of his questions addressed prejudice generally ("Do you believe it's okay to stereotype people?"). J.A. 187.. The other three questions don't deal with race or the facts of Bowman's case at all. Bowman doesn't argue that these non-race-related questions were essential to guaranteeing him a fair trial—likely because there's no indication that any of them would have unearthed any relevant prejudice that the prospective jurors harbored. Instead, he only asserts that the district court erred because it needed to probe the issue of racial bias. So that's the argument we respond to.

banc) (quoting *Rosales-Lopez*, 451 U.S. at 189 (plurality opinion)). Outside that context, the Constitution does not mandate that the district court ask the jury pool any questions about racial bias whatsoever.[9]

Bowman's case wasn't "inextricably bound up" with race. He was charged with possession and distribution of meth and conspiracy to complete that crime. Race is not an element of either of those offenses, and the evidence to support those charges did not deal with race at all—it consisted of drugs found in Bowman's car, evidence found on Bowman's phone, and Bowman's own statements. *Cf. Barber*, 80 F.3d at 968. True, Carr is White, and the Government presented evidence that Bowman and Carr were romantically involved. Yet we explicitly held in *Barber* that the mere existence of an interracial relationship is not enough to show that race is so "inextricably bound up" in a case that the Constitution requires the district court to ask about racial prejudice. *Id.* at 968–69. We also reject Bowman's invitation to assume that, just because the jury pool was all White, there was a constitutionally significant risk of racial prejudice. In our system, "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." *Rosales-Lopez*, 451 U.S. at 190 (plurality opinion).

---

[9] We have suggested that there may be some contexts in which a district court's failure to ask questions about race does not violate the Constitution but still amounts to a reversible abuse of discretion. As we explained in *United States v. Barber*, "we may find an abuse of discretion in a federal court's refusal to ask prospective jurors about racial prejudice only when (1) such a request has been made and (2) there is a 'reasonable possibility' that racial prejudice might influence the jury." 80 F.3d at 968. But Bowman only asserts constitutional error and does not appeal to any supposed supervisory authority we may have. So we limit ourselves to the constitutional inquiry.

"Accordingly, we cannot conclude that the court's refusal to" ask Bowman's questions "amounted to an unconstitutional abuse . . . of the court's discretion in conducting voir dire." *Barber*, 80 F.3d at 970. The court had already asked sufficient questions "to enable [it] 'to remove prospective jurors who w[ould] not be able impartially to follow the court's instructions and evaluate the evidence.'" *Caro*, 597 F.3d at 614 (quoting *Rosales-Lopez*, 451 U.S. at 188 (plurality opinion)). Those questions were broad enough to uncover bias, racial or otherwise. The court's refusal to ask any additional duplicative or immaterial questions was thus appropriate.

## 2. Peremptory Strikes

Bowman also asserts that the district court violated his Sixth Amendment rights by providing him with a juror list that contained less information than what had been provided to the Government. According to Bowman, this impaired his ability to exercise his peremptory strikes so much that he was forced to cede them to the district court. This denial of peremptory strikes, in Bowman's view, was a *per se* reversible constitutional error.

Peremptory strikes are a historical staple of jury selection. These strikes, which provide both parties the opportunity "to remove any potential juror for any reason—no questions asked," "can be traced back to the common law." *Flowers v. Mississippi*, 588 U.S. 284, 293 (2019). Thus, since before our Nation's birth, peremptory strikes have helped to eliminate "extremes of partiality on both sides" and have supported "the selection of a qualified *and unbiased* jury." *See Holland v. Illinois*, 493 U.S. 474, 484 (1990).

15

That said, the Supreme Court has made clear "that there is no freestanding constitutional right to peremptory challenges."[10] *Rivera v. Illinois*, 556 U.S. 148, 157 (2009). Rather, the strikes are "creature[s] of statute." *Id.* (quoting *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)). In federal court, they're provided by Federal Rule of Criminal Procedure 24(b). So denying a federal criminal defendant his peremptory strikes violates the federal rules but does not itself violate our Constitution.

Bowman only challenges the district court's actions under the Constitution. But the denial of or impairment to one's peremptory strikes only amounts to a constitutional error if he can show that a "member of his jury was removable for cause."[11] *Rivera*, 556 U.S. at 159. Remember, "peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial." *Georgia v. McCollum*, 505 U.S. 42, 57 (1992). So as long as the district court's denial of a criminal defendant's peremptory strikes does not impinge upon the defendant's right to an impartial jury, that denial does not offend the Sixth Amendment. *Rivera*, 556 U.S. at 159.

---

[10] Of course, this doesn't mean that the Constitution doesn't regulate *how* peremptory strikes may be exercised. *See Batson v. Kentucky*, 476 U.S. 79, 84 (1986).

[11] "Challenges for cause are typically limited to situations where actual bias is shown." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988). We have suggested that implied bias might also be a basis for a for-cause challenge in "extreme situations" *Id.* (citing *Smith v. Phillips*, 455 U.S. 209, 221–24 (1982) (O'Connor, J., concurring)). But the validity of even a narrow implied-bias doctrine is uncertain. *See Smith*, 455 U.S. at 215–18 (majority opinion) (rejecting the argument that a court can imply juror bias); *Fitzgerald v. Greene*, 150 F.3d 357, 365 (4th Cir. 1998) (declining to apply the implied bias doctrine even "[a]ssuming it remains a viable doctrine post-*Smith*").

16

Bowman denies that this is the correct standard. Instead, he argues that the denial or impediment of peremptory strikes is a *per se* reversible error. In support, he points to our decision *United States v. Ricks*, which stated "[t]he right to peremptory strikes . . . is a right of such significance that denial or substantial impairment of the right constitutes per se reversible error." 776 F.2d 455, 461 (4th Cir. 1985), *vacated on reh'g en banc*, 802 F.2d 731 (4th Cir. 1986).

Bowman's reliance on *Ricks* is misplaced for several reasons. First, the *Ricks* opinion that Bowman relies on was vacated, and the case was reheard en banc. The en banc court did not repeat the panel's "per se" language. The vacated panel decision thus carries no precedential weight. *See Quesinberry v. Life Ins. of N. Am.*, 987 F.2d 1017, 1029 n.10 (4th Cir. 1993) (en banc). However, the *Ricks* en banc court did "hold, for the reasons set forth by the majority [in the vacated *Ricks* opinion] . . . that there was an impermissible dilution of defendants' statutory right to peremptory challenges of prospective jurors necessitating reversal." 802 F.2d at 732. So, according to Bowman, the en banc court adopted all the panel's language.

Even if that were so, the en banc court in *Ricks* relied on the now-rejected dicta from *Swain v. Alabama*, 380 U.S. 202 (1965). *See Ricks*, 802 F.2d at 734. In *Swain*, the Supreme Court stated that "[t]he denial or impairment of the right [to peremptory challenges] is reversible error without a showing of prejudice." 380 U.S. at 219. Since then, however, the Supreme Court foreclosed any reliance upon it. Not only has it explicitly "disavowed" *Swain*'s "oft-quoted" dicta, *Rivera*, 556 U.S. at 160–61; *accord United States v. Martinez-Salazar*, 528 U.S. 304, 317 n.4 (2000), its decisions holding that courts' denials of

17

peremptory strikes did not amount to reversible error necessarily reject it, *Rivera*, 556 U.S. at 157–59; *Martinez-Salazar*, 528 U.S. at 316–17.

Consider the Supreme Court's decision in *Rivera*, 556 U.S. 148. During Rivera's criminal trial, the state court didn't allow him to peremptorily strike a juror because it erroneously determined the strike may have been racially motivated. *See id*. at 153. So that juror was seated on the jury that subsequently convicted him. *Id*. On appeal, Rivera argued that the court's denial of his peremptory strike amounted to a reversible error—but he didn't argue the juror was biased against him. *Id*. at 152. The Supreme Court thus faced the question: "If all seated jurors are qualified and unbiased, does the [Constitution] nonetheless require automatic reversal of the defendant's conviction" following the "erroneous denial of a defendant's peremptory challenge"? *Id*. at 151–52. It said no. As the Court explained, so long as "a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge . . . is not a matter of federal constitutional concern." *Id*. at 157. Since Rivera could not show that any "member of his jury was removable for cause," his "jury was impartial for Sixth Amendment purposes." *Id*. at 159. In other words, Rivera alleged no constitutional error, reversible or otherwise. *See id*. at 157–62.

*Rivera* forecloses Bowman's argument that we should apply *Rick*'s supposed *per se* rule. We are not bound by the published decisions of prior panels when those decisions have been abrogated by intervening Supreme Court precedent.[12]  *See United States v.*

---

[12] This principle applies equally to our later cases relying on *Ricks*. *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 504 (4th Cir. 2023).

*Dinkins*, 928 F.3d 349, 357–58 (4th Cir. 2019). We are instead bound by the Supreme Court's holding that the denial or impairment of a statutory right to peremptory strikes only amounts to a reversible, constitutional error if a juror was seated who was challengeable for cause.

Bowman points to no such juror. He rests his argument on his purported *per se* rule. In fact, he conceded at oral argument that if the *per se* rule doesn't apply, he loses. Oral Arg. 12:28 – 13:15. And for the reasons stated, the *per se* rule doesn't apply—so the district court did not violate Bowman's Sixth Amendment rights.

In so holding, we recognize that, for better or for worse, parties often have disparate amounts of information when deciding to exercise peremptory strikes. And that is particularly true when a criminal defendant proceeds *pro se*. Yet the Sixth Amendment does not require district courts to ensure equality of information and ability. Rather, we provide district courts with discretion to decide how to ensure a fair trial. And in exercising peremptory strikes, that discretion isn't abused if the district court doesn't require one party to give the other all its information on prospective jurors. *See Best v. United States*, 184 F.2d 131, 141 (1st Cir. 1950).

That said, we do not condone a *court* providing disparate information about prospective jurors to the defendant and prosecution. But while the district court could have conducted jury selection better, that doesn't mean it violated Bowman's constitutional right to an impartial jury. *See Sasaki v. Class*, 92 F.3d 232, 238–39 (4th Cir. 1996). Because Bowman points to no seated juror who was challengeable for cause, he has not established a Constitutional violation.

19

In sum, the district court did not violate Bowman's Sixth Amendment rights during jury selection. Both during voir dire and with regard to peremptory strikes, it exercised its discretion within the bounds the Constitution permits.

## C.     Evidence

Bowman's final challenges regard the evidence admitted—or not admitted—at trial. He argues that the district court erred by (1) allowing Carr to invoke her Fifth Amendment right not to testify, and (2) refusing to play the entire phone calls between him and Carr during closing arguments. We reject each argument in turn.

We review district courts' evidentiary rulings for abuse of discretion.[13] *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010).

### 1.     Carr's Testimony

Bowman contends the district court abused its discretion by allowing Carr to invoke her Fifth Amendment right not to testify. In Bowman's view, Carr was prohibited from invoking that right because she waived it in her plea agreement.

It is indeed true that Carr's plea agreement states that she waived her "right to remain silent at trial." J.A. 104. But that doesn't mean Bowman's argument prevails. Even assuming Carr's waiver could extend to this context, plea agreements are "governed by the law of contracts." *United States v. Martin*, 25 F.3d 211, 217 (4th Cir. 1994). And contracts can be enforced only by the parties to the contract or third parties that the contract

---

[13] With respect to Carr's testimony, the Government again argues that we should review only for plain error. But we need not decide whether Bowman preserved this issue because it fails even under the more forgiving abuse-of-discretion standard.

makes clear are its intended beneficiaries. *See R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 164 (4th Cir. 2004); Restatement (Second) of Contracts § 304 (Am. L. Inst. 1981). Bowman is neither. Carr promised *the Government* that she waived her right to remain silent, and nothing in the agreement contemplates Bowman as being the beneficiary of her guilty plea. So Bowman cannot hold Carr to her promise and mandate that she testify. *Cf. United States v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000).

Neither could the district court. It is also neither a party nor a beneficiary to Carr's plea agreement. It had no duty to seek out Carr's plea agreement or hold her to its terms. And Bowman points to no cases to the contrary. Each case he cites in support of his argument involves the district court's enforcing a plea agreement's waiver of the right not to testify (1) as between the Government and the defendant who pleaded guilty and (2) at the Government's request. *See United States v. Smalls*, 134 F. App'x 609, 612–14 (4th Cir. 2005) (per curiam); *United States v. Wise*, 603 F.2d 1101, 1102–04 (4th Cir. 1979). In contrast, when Bowman called Carr to testify and she invoked her Fifth Amendment right, the Government did not seek to enforce the promise Carr made to it.

The district court's obligation, therefore, was not to enforce the Government's contractual rights—it was to ensure Carr could exercise her constitutional rights. The Fifth Amendment protects an individual from "be[ing] compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. While Carr had pleaded guilty by the time Bowman called her as a witness, the Supreme Court "has . . . rejected the proposition that 'incrimination is complete once guilt has been adjudicated.'" *Mitchell v. United States*, 526 U.S. 314, 325 (1999) (quoting *Estelle v. Smith*, 451 U.S. 454, 462 (1981)). A person

21

retains her Fifth Amendment protections so long as there is still a possibility of further incrimination. *See id*. at 325–27. Here, Carr had yet to be sentenced when she took the witness stand. So she still had "a legitimate fear of adverse consequences from [her] testimony." *Id*. at 326. The district court was thus right to allow her to remain silent rather than force her to testify.

In short, neither the district court nor Bowman could enforce Carr's agreement with the Government. As a result, the district court did not err by allowing her to exercise her constitutional right.

### 2.      Phone Calls

Finally, Bowman asserts that the district court abused its discretion by declining his request to play the entirety of his jail calls with Carr during closing arguments. In his view, the district court was required to have the jury sit through an hour's worth of phone calls in addition to the rest of Bowman's closing statement.

Just as the district court is given broad discretion in jury selection and in making evidentiary decisions, it "is afforded broad discretion in controlling closing arguments." *United States v. Baptiste*, 596 F.3d 214, 226 (4th Cir. 2010) (citation omitted). This includes, for instance, the discretion to limit arguments "to a reasonable time" and "ensure that argument does not stray unduly from the mark." *Herring v. New York*, 422 U.S. 853, 862 (1975); *United States v. Wiley*, 93 F.4th 619, 631 (4th Cir. 2024).

The district court's decision not to play the four jail calls during closing arguments was within its discretion. Upon discovering that playing the calls would take an hour, the district court gave Bowman a chance to pinpoint parts of the calls that provided the context

22

he asserted was necessary to understand the portions of the calls the Government played. But Bowman couldn't point to any. He instead contended that the only way to provide the necessary context was to play the entire recordings. So the district court had to decide whether to play an hour's worth of phone calls—much of which could be irrelevant, repetitive, or confusing—or tell the jury that Bowman wanted them to listen to the whole of the calls during deliberations. It chose the latter. We cannot say that it abused its discretion by doing so. *See Wiley*, 93 F.4th at 631 (holding that the district court did not abuse its discretion by prohibiting legal definitions in closing arguments when those definitions could be "more confusing than helpful"); *cf.* Fed. R. Evid. 611(a) ("The court should exercise reasonable control . . . as to . . . avoid wasting time.").

*      *      *

Bowman thinks his convictions and sentence should be reversed. But none of the reasons he provides amounts to an error, let alone a reversible error. Rather, the district court's challenged actions fall within the broad leeway judges must have to manage trials. *See United States v. Janati*, 374 F.3d 263, 273–74 (4th Cir. 2004). So Bowman's convictions and sentence are

*AFFIRMED*.