**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4262**

---

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

JOSE JOYA PARADA, a/k/a Calmado, a/k/a Little Jason, a/k/a Menor,

> Defendant – Appellant.

------------------------------

A FORMER FEDERAL JUDGE AND SEVERAL UNITED STATES DEPARTMENT OF JUSTICE OFFICIALS; AMERICAN IMMIGRATION COUNCIL; NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, d/b/a National Immigration Project,

> Amici Supporting Appellant.

---

**No. 22-4281**

---

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

OSCAR ARMANDO SORTO ROMERO, a/k/a Lobo,

> Defendant – Appellant.

------------------------------

A FORMER FEDERAL JUDGE AND SEVERAL UNITED STATES DEPARTMENT OF JUSTICE OFFICIALS; AMERICAN IMMIGRATION COUNCIL; NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, d/b/a National Immigration Project,

        Amici Supporting Appellant.

---

**No. 22-4290**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

MILTON PORTILLO RODRIGUEZ, a/k/a Little Gangster, a/k/a Seco,

        Defendant – Appellant.

------------------------------

A FORMER FEDERAL JUDGE AND SEVERAL UNITED STATES DEPARTMENT OF JUSTICE OFFICIALS; AMERICAN IMMIGRATION COUNCIL; NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, d/b/a National Immigration Project,

        Amici Supporting Appellant.

---

**No. 22-4324**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

2

v.

JUAN CARLOS SANDOVAL RODRIGUEZ, a/k/a Picaro,

         Defendant – Appellant.

------------------------------

A FORMER FEDERAL JUDGE AND SEVERAL UNITED STATES DEPARTMENT OF JUSTICE OFFICIALS; AMERICAN IMMIGRATION COUNCIL; NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, d/b/a National Immigration Project,

         Amici Supporting Appellant.

Appeals from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Senior U.S. District Judge. (1:16-cr-00259-JKB-30; 1:16-cr-00259-JKB-29; 1:16-cr-00259-JKB-10; 1:16-cr-00259-JKB-11)

Argued: January 30, 2025                         Decided: April 9, 2025

Before DIAZ, Chief Judge, and AGEE and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion in which Chief Judge Diaz and Judge Wynn joined. Judge Wynn wrote a concurring opinion.

**ARGUED:** Andrew DeSimone, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellants. Anatoly Smolkin, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lauren M. McLarney, ROSENBERG MARTIN GREENBERG, LLP, Baltimore, Maryland, for Appellant Jose Joya Parada. Jeremy A. Thompson, Kimberly H. Albro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina, for Appellant Oscar Armando Sorto Romero. Stuart A. Berman, LERCH, EARLY & BREWER, CHARTERED, Bethesda, Maryland, for Appellant Milton Portilla Rodriguez. Jennifer C. Leisten, Jaclyn L. Tarlton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant Juan Carlos Sandoval Rodriguez. Erek L. Barron, United States Attorney, David C. Bornstein, Assistant United States Attorney, Chief, Appellate

3

Division, Kenneth S. Clark, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  Kathryn Ali, Meghan Palmer, ALI & LOCKWOOD LLP, Washington, D.C., for Amici American Immigration Council and National Immigration Project.  Oren Kreps, San Francisco, California, Catherine E. Stetson, Frank Liu, Amanda NeCole Allen, John Dong, HOGAN LOVELLS US LLP, Washington, D.C., for Amici Former United States Department of Justice Officials and a Former Federal Judge.

AGEE, Circuit Judge:

Jose Joya Parada, Oscar Armando Sorto Romero, Milton Portillo Rodriguez, and Juan Carlos Sandoval Rodriguez (together, "Appellants") were charged in 2018 with various racketeering offenses related to their alleged involvement with MS-13. After several COVID-19-related delays, their case proceeded to trial. During jury selection, the Government used several peremptory strikes on Black venirepersons, including Jurors 217 and 138. Appellants raised *Batson* challenges to these strikes, which the district court rejected. Subsequently, a full jury was empaneled and the trial began.

Following a lengthy trial, the case was submitted to the jury. Two days into deliberations, Juror 9 tested positive for COVID-19. The district court advised the parties of this development and solicited feedback on how to proceed. Over Appellants' objection, the district court opted to proceed with an eleven-member jury under Federal Rule of Criminal Procedure 23(b). Shortly thereafter, the jury reached its verdicts, finding some of the Appellants guilty on all charges, and others guilty on only some charges.

On appeal, Appellants challenge the district court's denial of their *Batson* challenges as to Jurors 217 and 138, as well as the district court's decision to proceed with an eleven-member jury. Because we discern no reversible error in the district court's decisions, we affirm.

I.

In 2018, Appellants were charged in the District of Maryland with various racketeering offenses related to their alleged involvement with MS-13, a Central American

gang. These offenses included conspiracy to participate in a racketeering enterprise, racketeering, and several offenses involving violent crime in aid of racketeering ("VICAR") related to the murder of four individuals associated with a rival gang.

## A.

The trial began on October 21, 2021, with jury selection, which spanned four days over two weeks. The venire panel consisted of seventy-eight prospective jurors which was narrowed to forty prospective jurors after the others were excused for cause. Twenty-eight were qualified as jurors and twelve were qualified as alternate jurors. Of the twenty-eight qualified jurors, eight were Black and twenty were white. And of the twelve alternates, nine were white, two were Black, and one was Asian-American.

At that point, the parties exercised their peremptory strikes. For their part, Appellants used all ten of their peremptory challenges to strike white jurors. They also struck two white alternate jurors and one Black alternate juror. The Government exercised its peremptory challenges to strike three white jurors and three Black jurors. It also struck three white alternate jurors. After the parties' respective peremptory strikes, seven white jurors and five Black jurors were selected for the jury. As for the alternates, four were white, one was Black, and one was Asian-American.

Appellants raised timely challenges to three of the Government's peremptory strikes—Jurors 217, 138, and 336—under *Batson v. Kentucky*, 476 U.S. 79 (1986). They argued that "three of the [Government's] six strikes were used to exclude . . . black

6

Americans." J.A. 1411. To understand these challenges and the district court's eventual rejection thereof, we briefly recount the relevant record as to the challenged jurors.[1]

### 1. Juror 217

Juror 217 was a Black United States citizen who was originally from Nigeria. He was a native English speaker, and by the time of trial, had lived in the United States for twenty-five years. Further, Juror 217 had answered "[n]o" to question thirty-nine on the jury questionnaire, which asked whether he had "any difficulty reading, writing or understanding the English language." J.A. 75, 550.

As it did with certain other jurors, the district court conducted an individual voir dire with Juror 217 to further inquire about his answers before jurors were excused for cause. Initially, the court had a "little difficulty hearing" his answers, and asked him to adjust his microphone. J.A. 551–52. Questioning then proceeded, and there are no explicit indications that any of Juror 217's subsequent answers were inaudible or incomprehensible to the court. However, Juror 217 was asked by the court to repeat or clarify his answers on numerous occasions to ensure that it was correctly understanding what he was saying. [*See, e.g.*, J.A. 551–59 (various instances of the court repeating or clarifying Juror 217's answers)].

After the court finished questioning Juror 217, the Government stated that "it may just be worth inquiring a little more about his language background or skills," as "[h]e's

---

[1] Appellants have not renewed their *Batson* challenge as to Juror 336 on appeal. Thus, we discuss the challenge as to that juror only insofar as it is relevant to understanding their arguments in the district court.

certainly a little bit hard to understand . . . and I have a little concern about his ability to deliberate." J.A. 559–60. The court declined to follow up, stating, "I'm not sure what I'm going to ask him that better reveals the situation. . . . There's no doubt that he has what we would describe as a powerful Nigerian accent, but I haven't seen that he has any difficulty understanding me." *Id.* The court also acknowledged that while it "had some difficulty understanding [Juror 217]," "with some patience and clarification, I think it's all come through." *Id.*; *see also id.* ("I think that [his accent] is what it is, and I don't find that to be disqualifying.").

Following this exchange, the Government opted not to make a formal motion to strike Juror 217 for cause, but later exercised a peremptory strike to excuse him. The defense challenged that move under *Batson* based on race and national origin, noting that the Government had used "three of their six strikes . . . to exclude . . . black Americans. There's a Nigerian and then two African Americans, and we believe that's a prima facie case of a *Batson* violation." J.A. 1411. The court "reserve[d] on the question of whether there's a prima facie case," and asked the government to "nonetheless proceed" and discuss the rationale for its peremptory strike.

The Government began by explaining that Juror 217 "had a very thick accent [that] was very difficult to understand." J.A. 1415. In its view, this accent would make it "very difficult for him to deliberate," prompting it to exercise a peremptory strike. *Id*. This rationale was consistent with the concerns initially raised by the Government during the individual voir dire conducted two days prior. *See* J.A. 560. ("He's certainly a little bit hard to understand . . . and I have . . . concern about his ability to deliberate in light of how tough

8

it is to understand him."). Defense counsel responded that Juror 217 had "a lovely accent as a Nigerian, now an American, and I had zero difficulty understanding him." J.A. 1415. He then accused the Government of "prod[ding] the [c]ourt to ask a bunch of questions to see if [it] could trip him for his English language impairments," despite the fact that in Nigeria, "he would have grown up being an English speaker." *Id.* Defense counsel continued by arguing, without elaboration, that the Government's proffered reason for its strike was "pretextual." *Id.*

The court then stated: "I'm not so concerned about race . . . as I am about national origin. How one speaks the English language is often very much tied up with their national origin. And we make a strong practice in our system of not discriminating against people as a function of their national origin." J.A. 1415–16. The court then stated that the Government's strike seemed "perilously close" to being "national origin" discrimination. J.A. 1416. The court nevertheless acknowledged that "if someone's facility with English is so strained or difficult that it truly would impair their capacity to deliberate, then even though that [accent] might be a product of national origin, it would still be a legitimate neutral, . . . justification or reason for excusing them," but that "you're going to have to persuade me that [your concerns] solely [relate to Juror 217's] accent, because I didn't detect a hint of a problem with his [] use of the language once I could penetrate and understand it." *Id.*

At that point, the Government expounded on its basis for the peremptory challenge: "I think the interaction with this gentleman . . . was difficult. . . . [T]here were repeated instances where the [c]ourt had to ask him to repeat things, to clarify things that were

9

unclear. And that is why we moved to strike him." J.A. 1416–17. The Government continued by emphasizing that its strike had "nothing to do with whether [Juror 217 was] from Nigeria or any other country." J.A. 1417. Instead, the strike stemmed from its concern that he "would have trouble deliberating." *Id.*; *see id.* (stating that Juror 217 "was . . . very difficult to understand and had . . . a lot of trouble communicating what he was trying to say, which required things to be repeated several times").

Before the court issued its ruling, defense counsel provided a final summary of the additional information learned about Juror 217 during voir dire: that he was a naturalized United States citizen; that he had received a college education in Nigeria; that he had worked at Jackson Hewitt doing tax returns; and that he had previously lived in New York, New York, and Randallstown, Maryland.

Ultimately, the district court held that there was no *Batson* violation. It first stated that it "disagree[d] with the [G]overnment in terms of [Juror 217's] suitability for jury service," before going on to find as follows:

> The question that I have to decide here is what's the [G]overnment's motivation in . . . exercising their peremptory challenge. And my conclusion is that, mistaken as I believe [the Government is], I believe that genuinely is their motivation here, that they do believe that his accent would be so substantial and so problematic as to interfere with his capacity to appropriately deliberate and confer with his colleagues on the jury and that it would impair their work.

J.A. 1418–19. The court continued, "I don't agree with that. But I don't think it's ridiculous. And I do not suspect that this is a proxy for a decision that [is] actually rooted in race or a desire to exclude [Juror 217] from serving on the jury because he has black skin or because he is a particular national origin." J.A. 1419. Having concluded that the

10

Government's "objection, as articulated here, [was] genuine," the court declined to find a *Batson* violation. *Id.*

### 2. Juror 138

Juror 138 was a Black woman who lived with her husband, daughter, and two grandchildren. In reviewing Juror 138's voir dire answer sheet, the court observed that she failed to answer several questions. *See* J.A. 435 (informing Juror 138 that "with respect to some of the questions you have not provided an answer"). It then read each of the unanswered questions out loud. Each time, Juror 138 provided a short response, and the district judge marked (and initialed) corresponding answers on the voir dire sheet. [*See* J.A. 435–45 (exchange between the court and Juror 138).]

The court then discussed several answers in an individualized voir dire with Juror 138, who indicated that she was not employed, and spent her time babysitting her two grandchildren at home "five days a week while their mother works." J.A. 441. Juror 138 also stated that she had a spouse who was retired and "help[s] with the [grandchildren]," but did not elaborate any further. J.A. 443–44.

After the court was finished reviewing Juror 138's answer sheet with her, it spoke to all counsel privately. During this exchange, defense counsel asked that the court query whether Juror 138 had any familiarity with MS-13 and also confirm that she would be available for the entirety of the nine-week trial. The court did so, with Juror 138 confirming that she had not heard of MS-13 and that she would have childcare covered if she was empaneled. *See* J.A. 445 ("THE COURT: If you're selected to serve on this jury of this

11

trial, it's probably going to last about nine weeks. Is that okay? PROSPECTIVE JUROR: Yes. THE COURT: Somebody going to watch the kids? PROSPECTIVE JUROR: Yes.").

At the end of jury selection, the Government used a peremptory challenge to excuse Juror 138, to which Appellants raised a *Batson* objection. As it did with Juror 217, the district court reserved the question of whether Appellants established a prima facie case and instead inquired into the rationale underlying the Government's strike.

The Government explained that Juror 138 "actually missed responding to a number of questions," and that when the court went through each of the missed questions with her, "[h]er demeanor during the inquiry, she did not seem particularly interested." J.A. 1412. It further explained that "in terms of her addressing the questions, I think in the written questionnaire she had not answered several questions and required the [c]ourt to walk her through those." J.A. 1413. In the Government's view, Juror 138's "approach to those questions and/or her failure to respond to them just . . . displayed a general lack of interest in the process." *Id.* It continued by noting that "we have a 17-page verdict questionnaire that's going to require someone to pay pretty close attention to it, so we thought that was certainly a concern for her." *Id.* The Government also flagged Juror 138's role as a caretaker as a secondary issue as it related to her availability for the lengthy trial.

The court asked if defense counsel wanted to be heard in response. Sandoval Rodriguez's counsel responded only by noting that Juror 138's husband would be able to babysit in the event she was unavailable. But none of Appellants' counsel said anything further in support of their *Batson* motion. They did not, for instance, argue that the Government's explanations were pretextual. Nor did they say anything to counter its

12

arguments concerning Juror 138's demeanor or failure to respond to several questions on the questionnaire.

After hearing the Government's explanations and inviting Appellants' counsel to respond, the district court rejected the *Batson* challenge: "I accept the [G]overnment's explanation for why they struck the juror, less on the child care. . . . But I accept the [G]overnment's representations as to their reasons for excusing her based on her . . . performance on the questionnaire, . . . [and capacity] to follow[] along with somewhat complex issues and so forth." J.A. 1414. The court continued by noting that it was "[c]ertainly . . . not finding that [Juror 138] lacked the acuity or the ability to serve as a juror." *Id.* Rather, it was simply "prepared to accredit the [G]overnment's assessment to that effect, and that that is their justification for why they disfavored her [as a] juror and that their decision with respect to her was not rooted in race." J.A. 1414–15.

B.

With a jury empaneled, the trial began and lasted for roughly thirty-four days (excluding deliberations) over the next three months. This length stemmed, in part, from the COVID-19 protocols employed at that time by the court.[2] The case was sent to the jury on Thursday, January 20, 2022. The three remaining alternate jurors were conditionally excused that same day, with the district court advising them that, "[if] during the course of

---

[2] For instance, one juror and two defendants tested positive for the virus in December. And at the time, there was a Standing Order prohibiting anyone who had tested positive for COVID-19 from entering the courthouse within five days of their infection. These positive tests therefore necessitated an extension of the already-scheduled holiday break. The trial later resumed without incident.

deliberations a juror were to become ill . . . or . . . otherwise unable to serve until the conclusion of deliberations . . . , then the [c]ourt would reach out and contact the next alternate in line and summon that person back to the courthouse to join the jury . . . to . . . resolve this case." J.A. 1454. The twelve-member jury proceeded to deliberate for two full days before breaking for the weekend.

On Sunday, January 23, 2022, Juror 9 contacted the Clerk of Court to report that she had tested positive for COVID-19. She reported that she started to feel poorly on Friday after the jurors were sent home, and that her "condition continued to deteriorate Saturday into Sunday, when she felt appreciably worse." J.A. 1496. Juror 9 nevertheless inquired whether "Zoom would be an option to allow us to close out," reporting that "we are so very close to the finish." J.A. 1497.[3] In response, the district court instructed the clerk to advise Juror 9 that her property at the courthouse would be secured and that the clerk would "be back in touch after the jury is excused in this case." J.A. 1497–98. The court also directed that all three alternate jurors return to the courthouse on Monday in case there were "additional positives . . . in light of No. 9 going positive." J.A. 1499. The eleven remaining jurors each took a COVID-19 test on Monday morning and all tested negative.

After confirming that there were no further COVID infections, the court sought input from the parties regarding the appropriate path forward. The various options given were: (1) "proceed under [Federal] Rule [of Criminal Procedure] 23[(b)] now with just

---

[3] Pursuant to the district court's Standing Order on COVID-19, Juror 9 was instructed not to come to the courthouse. Assuming that she was symptom-free by then, she would have been permitted to return the following Saturday at the earliest—i.e., a week later.

14

eleven jurors"; (2) "proceed under Rule 24" by replacing Juror 9 with an alternate juror; (3) "postpone the continuation of deliberations until juror No. 9 is restored to health"; or (4) allow Juror 9 to participate via Zoom. J.A. 1516.

The Government argued in favor of proceeding with an eleven-member jury to avoid additional delay, highlighting the "significant deliberations and . . . work already done by the existing jury." J.A. 1501; *see id.* (noting that "the latest communication from juror No. 9 [indicated] that the jury has done significant work and made significant progress already in this case"). Appellants disagreed, arguing that Juror 9 should be given time to get well and resume in-person deliberations, or otherwise be replaced by an alternate. They did, however, acknowledge that the district court had discretion to excuse Juror 9 and proceed with the eleven remaining jurors.

The district court weighed its options, and ruled that good cause existed to excuse Juror 9 and proceed under Rule 23 with the remaining eleven jurors. The court first observed that there was "great uncertainty" about when Juror 9 would test negative and be symptom-free for at least twenty-four hours, such that she could return to the courthouse to resume deliberations. It therefore concluded that "waiting for juror No. 9 to recover is not a practical option." J.A. 1514; *see* J.A. 1515 (noting that waiting for Juror 9 to recover would essentially "require the suspension of this deliberation for at least seven days," given COVID protocols). The court next rejected the possibility of deliberating via Zoom, concluding that it did not have "sufficient assurances that the deliberations would remain private," nor was it sufficiently assured that all jurors "would be on equal footing and have an equal opportunity to be heard and contribute" through such a medium. J.A. 1513. The

15

court found that seating an alternate juror to replace Juror 9 was a "less attractive option," in view of the extensive deliberative process already undertaken by the current jury. J.A. 1514. And the court rejected the possibility of declaring a mistrial since there were "options available to it, short of that Draconian response, that are fully consistent with law and due process." J.A. 1515–16.

Having rejected all other options, the court concluded that proceeding under Rule 23 with an eleven-person jury was the best course of action. In reaching this conclusion, it leaned in part on the fact that the jury was already "well along in the deliberative process by virtue of the fact that they have spent essentially two full days deliberating . . . and [that] the nature of their questions suggests that they are deep into the process." *Id.*

When the jurors returned to the courtroom, the district court informed them that Juror 9 had been excused from the jury and that the remaining jurors were to continue their deliberations subject to the court's previous instructions. It also reiterated that the jury should "take the time that [it] need[s] to fairly consider the evidence that has been presented . . . , and to take the time necessary to render fair and accurate verdicts." J.A. 1524–1525. The jury then resumed deliberations.

Later that day, the jury notified the clerk that they had reached a verdict. It found Parada, Portillo Rodriguez, and Sandoval Rodriguez guilty of all charged offenses. It found Sorto Romero guilty of most offenses, but acquitted him of charges related to one of the predicate murders.

16

The court later sentenced Portillo Rodriguez, Sandoval Rodriguez, and Sorto Romero to life imprisonment, and Parada to fifty years' imprisonment. All four timely appealed, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Appellants raise two main arguments on appeal. First, they argue that the district court clearly erred when it rejected their *Batson* challenges to the Government's peremptory strikes of Jurors 217 and 138. And second, they contend that the district court abused its discretion when it opted to proceed with an eleven-member jury. Before turning to the substance of these arguments, we set out the applicable standards of review.

A.

A district court's *Batson* finding—i.e., its determination of whether a peremptory strike was exercised for a prohibited reason—is reviewed only for clear error. *United States v. Green*, 599 F.3d 360, 377 (4th Cir. 2010). Such ample deference is due because a district court's finding on discrimination turns largely on credibility determinations. *See Hernandez v. New York*, 500 U.S. 352, 364–65 (1991) (plurality opinion); *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (noting that trial courts play "a pivotal role in evaluating *Batson* claims," particularly because the "best evidence" of discriminatory intent "often will be the demeanor" and "credibility" of the attorney striking the juror).

A court reviewing for clear error may not reverse a lower court's findings simply because it would have reached a different outcome. *United States v. Charboneau*, 914 F.3d 906, 912 (4th Cir. 2019) (citation omitted). Instead, reversible clear error only exists where,

17

after considering all evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Id.* (cleaned up).

B.

We review a district court's decision to proceed with an eleven-person jury under Federal Rule of Criminal Procedure 23 for abuse of discretion. *United States v. Levenite*, 277 F.3d 454, 464 (4th Cir. 2002); *United States v. Acker*, 52 F.3d 509, 515 (4th Cir. 1995). "Under the abuse of discretion standard, this Court may not substitute its judgment for that of the district court." *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009) (quoting *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995)). Rather, we must determine "whether the [district] court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *Id.* (quoting *Mason*, 52 F.3d at 1289).

III.

Armed with the applicable standards of review, we now turn to Appellants' first argument: that the district court committed clear error when it rejected their *Batson* challenges to the Government's peremptory strikes of Jurors 217 and 138. The Government disagrees, contending that the district court did not clearly err in crediting as neutral and legitimate its proffered reasons for these strikes. Cognizant of our limited role at this juncture, we agree with the Government as we do not discern any clear error on the record before us.

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on

18

account of their race." When announcing this rule, the Supreme Court also outlined a three-step burden-shifting framework for use in determining whether that rule had been violated. *See id.* at 93–98.

First, the party alleging discrimination in the exercise of a peremptory challenge must establish a prima facie case of intentional discrimination. *Hernandez*, 500 U.S. at 358 ("[T]he defendant must [first] make a prima facie showing that the prosecutor has exercised peremptory challenges on" a prohibited basis). Relevant circumstances may include a pattern of excluding jurors of a particular racial group, and the prosecutor's questions during voir dire. *See Batson*, 476 U.S. at 89.

Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race- and/or national origin-neutral explanation for striking the jurors in question.[4] *See Hernandez*, 500 U.S. at 358–59 (citing *Batson*, 476 U.S. at 97–98). This explanation need not be persuasive or plausible—just neutral. *United States v. Barnette*, 211 F.3d 803, 812 (4th Cir. 2000). An explanation will be "deemed . . . neutral" so long as "a discriminatory intent" is not "inherent in the prosecutor's explanation." *Hernandez*, 500

---

[4] While this Court has yet to explicitly extend *Batson* to prohibit peremptory challenges made on the basis of national origin, we have little issue finding that it does. *Batson* draws upon the Equal Protection Clause, which, in turn, has been held to prohibit national origin-based discrimination. *See Batson*, 476 U.S. at 89 (holding that the "State's privilege to strike individual jurors through peremptory challenges[] is subject to the commands of the Equal Protection Clause"); *see, e.g.*, *United States v. Stephens*, 514 F.3d 703, 709 (7th Cir. 2008) ("The Constitution prohibits the use of peremptory challenges to intentionally discriminate against jurors on the basis of protected characteristics such as race, national origin, and gender."); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) ("To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin, or gender.").

U.S. at 360. And like the other steps of the *Batson* inquiry, this Court affords "great deference to the trial judge in making the determination as to whether the proffered reason for the challenge is . . . neutral." *Barnette*, 211 F.3d at 812; *see United States v. Blotcher*, 142 F.3d 728, 731 (4th Cir. 1998) ("The district court's determination of whether the proffered explanation for the use of a peremptory challenge is pretextual and whether there has been purposeful racial discrimination largely turn[s] on credibility" and is therefore owed "great deference").

And third, if the prosecutor offers a race- or national origin-neutral basis for the exercise of the peremptory challenges, the "trial court then has the duty of deciding whether the defendant has carried his burden [of] prov[ing] purposeful discrimination." *Barnette*, 211 F.3d at 812; *see Hernandez*, 500 U.S. at 362. This step often boils down to whether the district court is persuaded that the Government's proffered neutral reason for its strike is its *actual* motivation. *See United States v. Wiley*, 93 F.4th 619, 629 (4th Cir. 2024) (noting that at *Batson*'s third step, the defendant "had to show that [the government's legitimate] explanation was 'merely pretextual' and that the government's 'real reason' for striking the jurors was because of their race"); *United States v. Taylor*, 92 F.3d 1313, 1326 (2d Cir. 1996) ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."). Given the fact-intensive nature of this inquiry, the district court's decision on this issue is again accorded substantial deference. *See Hernandez*, 500 U.S. at 364 (reiterating that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact" subject only to clear error review); *Blotcher*, 142 F.3d at 731

20

(emphasizing the "great deference" owed to district courts' determinations of "whether there has been purposeful racial discrimination").

One final point: once a prosecutor has offered a race- or national origin-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, "the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359. In other words, in cases where the prosecutor offers a neutral explanation for its peremptory strikes, the *Batson* analysis proceeds directly to steps two and three. *See Wiley*, 93 F.4th at 629 ("Because the government offered a race-neutral explanation in the district court, we assume, without deciding, that [the defendant] established a prima facie showing of discrimination at step one.").

With this framework in mind, we turn now to consider the district court's rejection of Appellants' *Batson* challenges.

## A.

Beginning with Juror 217, the district court explicitly "reserve[d] on the question of whether [Appellants established] a prima facie case" of intentional discrimination. J.A. 1412. It instead "ask[ed] the [G]overnment . . . to nonetheless proceed" to the second step of the *Batson* inquiry—proffering a neutral reason for the strike. *Id.* This decision by the

21

district court rendered moot "the preliminary issue of whether [Appellants] had made a prima facie showing." *Hernandez*, 500 U.S. at 359.[5]

Moving to the second step, the Government articulated the following reasoning for its strike of Juror 217: "He had a very thick accent, was very difficult to understand. As we said [before], we thought that it would be very difficult for him to deliberate. And as a result . . . we thought he should be stricken." J.A. 1415. After initially expressing some concern with this rationale, the district court went on to recognize that "if someone's facility with English is so strained or difficult that it would truly impair their capacity to deliberate, then even though that language situation might be a product of national origin, it would still be a legitimate neutral . . . justification . . . for excusing them." J.A. 1416. This exchange satisfied the Government's burden on step two of the *Batson* inquiry.

As previously noted, the explanation itself need not be persuasive or plausible—just facially neutral. *Barnette*, 211 F.3d at 812. And here, the district court deemed facially neutral the Government's concern that Juror 217's accent could impact his ability to effectively deliberate. Its decision to do so was not clearly erroneous. To be sure, there is nuance to the question of whether accent-based peremptory strikes are permissible. And the answer to that question will necessarily vary based on the specifics of any given case. *Hernandez*, 500 U.S. at 364–65 (emphasizing the fact- and credibility-intensive nature of

---

[5] The Government spills much ink arguing otherwise. *See* Resp. Br. 31–33. But it cannot avoid the plain, contrary language of *Hernandez*. 500 U.S. at 359; *see also United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989) ("[T]his Court will not address the question of whether the defendant established a prima facie showing to satisfy *Batson* where the prosecutor articulated reasons for his strikes.")

the *Batson* inquiry). But where, as here, the accent-based peremptory strike stems from otherwise legitimate concerns—i.e., a juror's ability to effectively deliberate and interact with the other jurors—we are satisfied that it facially qualifies as race- and national origin-neutral. Other circuit courts to address this issue have recognized the same. *See United States v. Changco*, 1 F.3d 837, 840 (9th Cir. 1993) ("If the prosecutor had doubts about the [juror's] ability . . . to . . . deliberate effectively with the other jurors, she had ample grounds for striking them."); *cf. Iyoha v. Architect of the Capitol*, 927 F.3d 561, 567 (D.C. Cir. 2019) (noting that, while "a foreign accent and national origin are often intertwined," an employee's accent might nevertheless "be a legitimate basis for an employment action" if it "interfere[s] with their ability to do their job"); *Carino v. Univ. of Okla. Bd. of Regents*, 750 F.2d 815, 819 (10th Cir. 1984) (suggesting that accent or "language difficulties that interfere with performance of [an employee's] duties may be legitimately considered in employment decisions").

Turning to *Batson*'s final step, the district court was required to decide the ultimate question of "whether the defendant . . . carried his burden [of] prov[ing] purposeful discrimination." *Barnette*, 211 F.3d at 812; *see Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."). As previously noted, this step frequently centers on whether the district court finds that the Government's *proffered* neutral reason for its strike is its *actual* motivation. *See Wiley*, 93 F.4th at 629; *United States v. Taylor*, 92 F.3d 1313, 1326 (2d Cir. 1996) ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge

23

should be believed."). After grappling with the issue, the district court credited the Government's race-neutral explanation. *See* J.A. 1419 ("I do not ascribe [an improper] motivation to [the Government's attorneys] in these circumstances."). A review of the record establishes that this decision was not clearly erroneous.

To begin, the district court—on numerous occasions—had to repeat Juror 217's answers back to him to ensure it understood him correctly. [*See, e.g.*, J.A. 551–59.] The transcript also reflects various instances in which the district court had to ask Juror 217 to repeat his answers. [*See, e.g.*, J.A. 554–55, 558–59.] But perhaps most tellingly, the district court expressly acknowledged that "[t]here's no doubt that [Juror 217] has what we would describe as a powerful Nigerian accent . . . . I have had some difficulty understanding him as he spoke with his accent, but *with some patience and clarification*, I think it's all come through." J.A. 560 (emphases added). The court then reiterated this point on multiple occasions. *See* J.A. 1416 ("I didn't detect a hint of a problem with his actual use of the language *once I could penetrate the accent and understand it*." (emphasis added)); J.A. 1418 ("I didn't find his accent so strong and so powerful as to interfere with *my* ability to understand him, *particularly* if I was *prepared to make an effort to really try hard to listen to him*." (emphases added)).[6] These exchanges lend support to the Government's purported rationale for its strike—that Juror 217's accent could have impeded his ability to thoroughly participate in deliberations. And it is a dubious proposition to suggest that Juror

---

[6] Also notable is that the Government's concerns with Juror 217 remained consistent. Indeed, it flagged the potential accent/communication concern immediately, *see* J.A. 560, and provided the same as the rationale for its peremptory strike, *see* J.A. 1415.

24

217's co-jurors would have the district court's "patience" or willingness to "make an effort to really try hard to" "penetrate [his] accent and understand [him]." J.A. 1416.

Ultimately, this case is no exception from the general rule that there is seldom much evidence on the "decisive question" of the *Batson* inquiry—i.e., whether counsel's "neutral explanation for [its] peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365. This rule holds particularly true on appeal, as "the best evidence often will be the demeanor [and credibility] of the attorney who exercises the challenge." *Id*. For that reason, courts have repeatedly emphasized that evaluation of "the prosecutor's state of mind based on demeanor and credibility lies peculiarly within the trial judge's province." *Id.* (cleaned up). Here, the district court thoughtfully weighed such considerations before issuing its ruling: "I believe that genuinely . . . is their motivation here, that [Juror 217's] accent would be so substantial . . . as to interfere with his capacity to appropriately deliberate and confer with his colleagues on the jury and that it would impair their work." J.A. 1419. This finding largely ends this Court's inquiry on appeal. *See Hernandez*, 500 U.S. at 364 (explaining that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal").[7]

---

[7] Contrary to Appellants' argument, it is immaterial that the district court *personally* disagreed with the Government's assessment of Juror 217's accent. In fact, the district court explicitly acknowledged as much: "I disagree with the [G]overnment in terms of his suitability for jury service. . . . But that doesn't determine the issue. The question that I have to decide here is what's the [G]overnment's motivation." J.A. 1418; *Hernandez*, 500 U.S. at 364 (noting that *Batson*'s third step involves determining whether the proponent of a strike "intended to discriminate"). The critical point is instead that, even though the district court disagreed with the Government, it found that the Government lacked the requisite discriminatory intent. *See* J.A. 1419 ("I don't agree with [the Government's (Continued)

And in any event, we find unpersuasive Appellants' bases for arguing that the Government's strike of Juror 217 was pretextual.

First, Appellants press aspects of Juror 217's personal background demonstrating that Juror 217 was proficient in English. But whether Juror 217 was proficient in English doesn't impact other jurors' ability to understand him.

Second, Appellants observe that the transcript of the proceedings below lacks notations from the court reporter indicating that Juror 217 was "incomprehensible." Yet, we wouldn't expect such notations when the presiding judge frequently repeated Juror 217's statements. Appellants also note that one of their lawyers asserted that he had no difficulty understanding Juror 217, but this self-serving statement doesn't persuade us that there weren't issues understanding Juror 217 given other statements in the record.

Third, Appellants insist that the strike was pretextual since Defendants and Juror 217 are all foreign-born and members of racial or ethnic minority groups. But Appellants paint with too wide a brush. There is no evidence that the Government thought that Juror 217 would be biased toward Appellants simply because he was from Nigeria and they were from El Salvador.

Fourth, Appellants point to the Government asking the district court to conduct additional voir dire into Juror 217's language abilities. We view this fact not as signaling the Government's discriminatory intent, but as indicating the Government's desire to

---

rationale]. But I don't think it's ridiculous. And I don't suspect that this is a proxy for a decision that is actually rooted in race or a desire to exclude [Juror 217] . . . [on the basis of his] national origin. I do not ascribe that motivation to [the Government].").

26

understand better Juror 217's ability to participate effectively in jury deliberations. We similarly don't see discrimination in the Government's erroneous passing assertion that it made a for-cause strike. The assertion came after several days of jury selection proceedings, and the prosecutor appears to have been speaking from memory.

Lastly, Appellants suggest that Black venirepersons were struck at a rate two-and-a-half times greater than that of white venirepersons. This statistic is "both selective and uninformative." *Allen v. Lee*, 366 F.3d 319, 330 (4th Cir. 2004) (en banc). Seventy-eight people participated in voir dire, and 27% of those venirepersons were nonwhite. After for-cause challenges, there were 27.5% nonwhite venirepersons. The government struck 27% of qualified nonwhite venirepersons. And the empaneled jury had 41.7% Black jurors. The stable percentage of nonwhite representation at each stage of the jury selection process cuts against Defendants' statistical argument. *See United States v. Runyon*, 994 F.3d 192, 212 (4th Cir. 2021); *United States v. Mitchell*, 877 F.2d 294, 303 (4th Cir. 1989).

Even considered holistically, the indicia of discrimination Appellants ascribe to the Government don't convince us that the district court erred. Therefore, because the record simply does not leave us "with [a] definite and firm conviction that a mistake has been committed," *Charboneau*, 914 F.3d at 912, we affirm the district court's rejection of Appellants' *Batson* challenge as to the Government's peremptory strike of Juror 217.

B.

We turn now to consider Appellants' *Batson* challenge to the strike of Juror 138. Just as it did with Juror 217, the district court "reserve[d] on the question of whether [Appellants established] a prima facie case" of intentional discrimination, J.A. 1412, and

27

instead directed "the [G]overnment . . . to nonetheless proceed" to the second step of the *Batson* inquiry. *Id.* In doing so, it again mooted "the preliminary issue of whether [Appellants] had made a prima facie showing" of discrimination. *Hernandez*, 500 U.S. at 359; *see Lane*, 866 F.2d at 105.

At step two, the Government indicated that it struck Juror 138 out of concerns over (1) her interest level in the proceedings and (2) her ability to find alternate childcare arrangements, particularly given that she was the primary caregiver for her grandchildren on weekdays.[8] [*See* J.A. 1412.] And at step three, the district court "accept[ed] the government's explanation for why they struck [Juror 138]." J.A. 1414. It did so "less on the childcare," and instead "accept[ed] the government's representations . . . based on [Juror 138's] . . . performance on the questionnaire, her capacity to answer the questions, follow along with somewhat complex issues and so forth." *Id.* The court then clarified that it was not "finding that [Juror 138] lacked the . . . ability to serve as a juror," rather, that it was simply "accrediting the government's assessment to that effect," and "that that is their justification for why they disfavored her." J.A. 1414–15.

On the limited record before us, we once again discern no clear error in the district court's conclusion. Certainly, the transcript does reflect that Juror 138 gave many curt answers during voir dire. The transcript likewise reflects that she failed to properly fill out

---

[8] Appellants largely declined to challenge either rationale as pretextual, noting only that Juror 138 seemed to have coverage for her childcare responsibilities should she be empaneled as a juror. We conclude that Appellants forfeited their ability to argue that the Government's motives as to Juror 128 were pretextual and decline to exercise our discretion to revive this forfeited issue. *United States v. Laffitte*, 121 F.4th 472, 484 (4th Cir. 2024).

the juror questionnaire. Beyond that, however, we are largely left with the district court's assessment of whether counsel's "race-neutral explanation for [its] peremptory challenge should be believed."[9] *Hernandez*, 500 U.S. at 365. As already noted, this assessment is primarily based on factors that are not easily reviewable on appeal. *See id.* And for reasons like those stated with respect to Juror 217, we simply have no reason to doubt the district court's findings on this matter, particularly given its crucial role in making credibility-related determinations. *See id.* Accordingly, we find no clear error and thus affirm the district court's rejection of Appellants' *Batson* challenge to the Government's peremptory strike of Juror 138.

* * *

On appeal, we are tasked with the limited role of deciding whether the district court clearly erred in its *Batson* analysis. And here, it avoided any such error by carefully considering the issues and providing thoughtful reasons for rejecting Appellants' *Batson* challenges. So, while a venireperson's accent *could* potentially be wielded as an impermissible proxy for race or national origin, we find no clear error in the district court's contrary finding on this record. We thus affirm the district court's rejection of Appellants' *Batson* challenge to the Government's peremptory strikes of Jurors 217 and 138.

---

[9] On this point, it is also worth reiterating the actual racial composition of the jury: seven white jurors and five Black jurors. This—and the other statistical evidence provided by the Government—lend further support to the district court's findings that the Government did not discriminate in its use of peremptory strikes.

IV.

The second issue on appeal relates to the district court's decision to dismiss Juror 9 and proceed with an eleven-member jury. Appellants argue that this decision was an abuse of discretion. The Government disagrees, emphasizing that the district court thoroughly considered all alternative options and reasonably concluded that proceeding with an eleven-member jury was the best approach. Having reviewed the record, we agree with the Government and therefore affirm the district court's decision.

Federal Rule of Criminal Procedure 23 governs this issue. It provides, in relevant part, that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed. R. Crim. P. 23(b). We have applied Rule 23 on various occasions to affirm the excusal of a single juror during deliberations. *See, e.g.*, *Levenite*, 277 F.3d at 464–65 (permitting an eleven-person jury under Rule 23 where a juror fell ill with the flu during deliberations); *Acker*, 52 F.3d at 515–16 (permitting an eleven-person jury under Rule 23 where a juror was excused for an injury and it was unclear when she would be able to return); *United States v. Green*, 260 F. App'x 550, 551 (4th Cir. 2007) (permitting an eleven-person jury where a juror was excused for the death of her grandmother). We see no reason to stray from that precedent here.

To begin, Rule 23(b)—and our case law—explicitly permit the course of action taken by the district court. *See* Fed. R. Crim. P. 23(b); *see, e.g.*, *Levenite*, 277 F.3d at 464–65. The more relevant question, then, concerns whether the district court sufficiently considered and explained its decision. *See Vidacak*, 553 F.3d at 348 (noting that the

30

determinative question on abuse of discretion review is "whether the [district] court's exercise of discretion . . . was arbitrary or capricious"). A review of the record confirms that it did. To that end, the district court found good cause to dismiss Juror 9 and proceed with an eleven-person jury only after soliciting the opinions of counsel and thoroughly considering all possible alternatives. *See* J.A. 1499 ("I'll take counsel's views on the appropriate way forward and then . . . we'll make a decision about which way we're going to go."); *see also* J.A. 1499–1511 (discussion with counsel regarding potential paths forward).

Specifically, the court considered: (1) "proceed[ing] under Rule 23 with just [eleven] jurors," J.A. 1516; (2) "proceed[ing] under Rule 24" by replacing Juror 9 with an alternate juror, *id.*; (3) "postpon[ing] the continuation of deliberations until [Juror 9] is restored to health," *id.*; and (4) allowing Juror 9 to participate via Zoom. The court then ranked these in terms of desirability, noting the pros and cons of each. *See* J.A. 1514–16. After considering all these avenues, it concluded that "[t]he best option [was] to proceed with [eleven] jurors" under Rule 23. J.A. 1516; *see* J.A. 1518 ("Taking the circumstances of our case and our situation into specific account, I conclude that not only do I have the discretion to proceed [under Rule 23(b)], but that this is the correct way forward among the various options that are available."). Nothing about the process the district court undertook, or its explanation, strikes us as "arbitrary or capricious." *Vidacak*, 553 F.3d at 348. We therefore affirm its decision to excuse Juror 9 and permit an eleven-member jury to continue deliberations.

31

V.

For the foregoing reasons, the district court's judgment is

*AFFIRMED.*

32

WYNN, Circuit Judge, concurring:

I concur in the majority opinion but write separately to point out that our circuit stands alone by employing deferential review at *Batson*'s step two.

At step two of *Batson*, the trial court determines whether the proffered reason for a peremptory strike is facially race- and national-origin-neutral. As a Supreme Court plurality put it, this question is "a matter of law," *Hernandez v. New York*, 500 U.S. 352, 359–60 (1991) (plurality opinion), which suggests that appellate courts should review *Batson*'s second step de novo. Accordingly, all of the other federal courts of appeals that have addressed this question review step two de novo. *See United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001) ("We analyze the Government's proffered racially neutral explanation as a legal issue de novo."); *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) ("At *Batson*'s second step, the question whether the state has offered a race-neutral reason is a question of law that we review de novo." (quotation marks omitted)); *United States v. Sneed*, 34 F.3d 1570, 1580 (10th Cir. 1994) ("We review *de novo* whether the prosecutor's explanation is facially race neutral.").

Our outlier stance arises from our decision in *United States v. Barnette* where we said that we should grant "great deference to the trial judge in making the determination as to whether the proffered reason for the challenge is race neutral" at step two. 211 F.3d 803, 812 (4th Cir. 2000). But in so holding, we relied on a *step three* case. *See id.* (citing *United States v. Blotcher*, 142 F.3d 728, 731 (4th Cir. 1998) (holding that we grant deference to the trial judge's "credibility determinations" at step three)). It makes good sense to exercise deference at step three because that step requires the trial court to make a credibility

33

determination when it assesses whether the government's proffered reasons are pretextual. But that reasoning does not carry over to the *legal* question posed at step two.

Nevertheless, we are bound by *Barnette* which requires us to grant deference to the trial judge at step two. Majority Op. at 19. Though I think that the result here would be the same regardless, this is a correction that we should consider—summarily—in an en banc proceeding.